**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES J. MCDERMOTT, Regional
Director of Region 31 of the
National Labor Relations Board,
for and on behalf of the National
Labor Relations Board,
            *Petitioner-Appellant,*

                v.

AMPERSAND PUBLISHING, LLC,
doing business as The Santa
Barbara News-Press,
            *Respondent-Appellee.*

No. 08-56202

D.C. No.
2:08-cv-01551-
SVW-MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
March 11, 2009—Pasadena, California

Filed January 26, 2010

Before: Michael Daly Hawkins, Richard R. Clifton and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Hawkins

1447

## COUNSEL

Ronald Meisburg, John E. Higgins, Jr., Barry J. Kearney, Judith I. Katz, Steven L. Sokolow, and Margaret E. Luke (argued), National Labor Relations Board, Washington, D.C., for the petitioner-appellant.

Framroze M. Virjee and Michael Garrison, O'Melveny & Myers LLP, Los Angeles, California; Sri Srinivasan (argued), O'Melveny & Myers LLP, Washington, D.C.; Ryan W. Rutledge, O'Melveny Myers, LLP, Newport Beach, California; A. Barry Cappello, Troy A. Thielemann, Matthew Clarke, and Dugan Kelley, Cappello & Noel, LLP, Santa Barbara, California, for the respondent-appellee.

Barbara L. Camens, Barr & Camens, Washington, D.C.; Ira L. Gottlieb, Bush Gottlieb Singer Lopez Kohanski Adelstein & Dickenson, Glendale, California, for amici curiae the Graphics Communications Conference of the International Brotherhood of Teamsters and the Newspaper Guild/Communications Workers of America.

L. Michael Zinser, The Zinser Law Firm, P.C., Nashville, Tennessee; Bruce D. Brown, Baker & Hostetler LLP, Washington, D.C., for amicus curiae Newspaper Association of America.

L. Michael Zinser, The Zinser Law Firm, P.C., Nashville, Tennessee, for amici curiae Gannett Co., Inc.; Lee Enterprises, Inc.; Medianews Group, Inc.; and Stephens Media, LLC.

**OPINION**

CLIFTON, Circuit Judge:

National Labor Relations Board Regional Director James J. McDermott (the Regional Director) appeals the district court's denial of temporary injunctive relief under Section 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j). The district court decided that "a significant risk of a First Amendment violation" would arise if Ampersand Publishing, LLC, doing business as The Santa Barbara News-Press, were forced, among other things, to reinstate employees it discharged for union activity directed at pressuring the newspaper's owner and publisher to refrain from exercising editorial control over news reporting. *McDermott ex rel. NLRB v. Ampersand Publ'g LLC*, 2008 U.S. Dist. LEXIS 94596, at *39 (C.D. Cal. May 21, 2008). Weighing the equitable factors generally applicable to a claim for interim injunctive relief with an eye toward the greater burden needed to grant an injunction that threatens to infringe First Amendment rights, the district court denied the petition. We affirm.

The First Amendment protects the right of a newspaper to control its content. The main thrust of the employees' campaign to secure representation by the Graphic Communications Conference, International Brotherhood of Teamsters (the Union) appears to have been to block or limit the influence of the owner and publisher of the News-Press over the content of the news sections of the paper and to focus that authority in the employees themselves, as reporters and editors. We conclude that the district court correctly required a heightened showing of equitable need under our case law, because the interim relief sought by the government in support of union activity aimed at obtaining editorial control poses a threat of violating the rights of the News-Press under the First Amendment. Applying the Supreme Court's recent guidance on the general standard for granting preliminary injunctions, we further determine that the district court did not abuse its discre-

tion in declining to order the interim injunctive relief sought by the Regional Director.

## I.  Background

As described in more detail below, an NLRB administrative law judge (ALJ) presided over a trial and produced a lengthy recommended decision and order in this case, currently pending before the Board itself. The factual narrative provided here is largely drawn from the findings of fact made by the ALJ as part of that decision.

The News-Press is a daily newspaper published in Santa Barbara, California. The News-Press's owner and co-publisher, Wendy McCaw, purchased the paper in 2000 through her privately-held company, Ampersand Publishing.

Beginning in 2004, McCaw voiced concerns that the paper's news reporting was sometimes biased. She took various actions to try to eliminate the bias she perceived, including issuing warning letters to reporters and conducting staff training sessions. Early in July 2006, following a series of clashes over what the district court described as "issues of content," several editors and reporters resigned from their positions at the News-Press to protest what they perceived as unethical interference in the news-reporting function of the newspaper by McCaw and her co-publisher, Arthur von Weisenberger.

The ALJ found that these resignations prompted the remaining News-Press newsroom employees to seek out the Union. On July 6, 2006, about thirty employees met with Union representatives. After discussions with the Union, the employees drafted a letter to the News-Press, dated July 13, 2006, listing four demands:

> 1. Restore journalism ethics to the Santa Barbara News-Press: implement and maintain a clear separa-

tion between the opinion/business side of the paper and the news-gathering side.

2. Invite back the six newsroom editors who recently resigned . . . .

3. Negotiate a contract with the newsroom employees governing our hours, wages, benefits and working conditions.

4. Recognize [the Union] as our exclusive bargaining representative.

The next day, July 14, the Union and its employee supporters held a rally in front of the News-Press building where these same four demands were read aloud. At another event staged four days later, News-Press reporters held up four signs, each stating one of the demands from the July 13 letter.

The News-Press delivered its response to the employees' July 13 letter on July 17. The response stated that the newspaper "respected the employees' right to decide whether or not . . . to have union representation" but declined to recognize the Union or to invite back the editors who had resigned. At an internal staff meeting in late July, city editor Scott Steepleton answered employees' questions concerning McCaw's involvement in the news department by saying that, as the owner of the paper, McCaw "had the right to be part of whatever she wants to be part of." The paper later published editorials criticizing the Union and proclaiming that it was "standing firm against allowing outside Union organizers to influence news coverage or interject bias into reporting."

At an event on July 20, 2006, the employees unveiled their campaign to persuade readers to cancel their subscriptions by September 5 "if [the employees'] demands were not met." They distributed pledge cards at that event and at various other functions in the months that followed that said:

> I, _____, support the Santa Barbara News-Press newsroom staff in its effort to restore journalistic integrity to the paper, obtain recognition and negotiate a fair employment contract. Cancel my subscription by Sept. 5, 2006, if the employees' demands have not been met to their satisfaction.[1]

The ALJ found that this "subscription cancellation effort became the centerpiece of the Union's campaign concerning the News-Press." On September 5, the Union and its supporters held a press conference announcing that the employees' demands had not been met and asking the public to cancel their subscriptions to the News-Press to show their support. On September 24, employees organized a rally and fundraiser complete with a large banner bearing the message "Cancel Your Newspaper Today." During the campaign, union supporters made public statements such as "Don't let McCaw control the news" and "Help us take back the News-Press."

The Union filed a petition with the NLRB on August 10, 2006, to represent a unit of news department employees at the News-Press. The NLRB conducted an election on September 27, 2006, which the Union won by a vote of 33 to 6. Overruling the News-Press's objections to the election, the NLRB certified the Union as the exclusive bargaining representative of the news department employees on August 16, 2007. Negotiations for a collective-bargaining agreement commenced on November 13, 2007. No agreement has been reached.

Between August 2006 and March 2007, the Union filed a series of charges with the NLRB alleging that the News-Press had engaged in a variety of unfair labor practices. On May 31, 2007, the Regional Director issued an amended and consoli-

---

[1] The original demand to invite back the editors who had resigned in protest was omitted from the pledge cards and was not thereafter linked to the subscription cancellation drive.

dated complaint against the News-Press. Among other things, the complaint alleged that the News-Press had violated paragraphs 8(a)(1) and (a)(3) of the NLRA[2] by discharging eight employees because they engaged in union activity. One of those employees was terminated in October 2006, another in January 2007, and the other six in February 2007. The complaint also alleged that the News-Press had committed a host of additional unfair labor practices ranging from improperly reprimanding employees to failing to provide employees with adequate raises and bonuses.

A 17-day trial before an ALJ was conducted on the allegations in the complaint. On December 26, 2007, the ALJ issued a recommended decision and order. He concluded that the News-Press had committed numerous unfair labor practices and recommended that relief be granted, including reinstatement of the eight discharged employees, constituting more than 20 percent of the newsroom staff.

Regarding the News-Press's First Amendment defenses, the ALJ observed that "a purpose of the union activities of the employees was directed toward what they viewed as a need to restore journalistic integrity at the News-Press." He identified the "First Amendment protection of Freedom of the Press" as the "starting point in this analysis." The ALJ recognized that "this protection belongs to the publisher of a newspaper and not to the reporters in their role as employees."

---

[2]Those provisions of the NLRA read in relevant part:

(a) It shall be an unfair labor practice for an employer —

(1) to interfere with, restrain, or coerce employees in the exercise of the rights [to organize and engage in collective bargaining activities] guaranteed in section 157 of this title;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a)(1), (3).

Nevertheless, he concluded that the First Amendment does not limit government-mandated collective bargaining aimed at "restoring editorial integrity." Such collective bargaining was warranted, the ALJ reasoned, because the News-Press had engaged in "conduct that employees believe undermines their credibility as journalists" and adopted policies that "could be viewed [as] vague and ambiguous." Thus, the ALJ concluded that "the matter of journalistic integrity may be a matter over which employees may bargain through its collective-bargaining representative."

The ALJ rejected the notion that "the employees were attempting to gain entrepreneurial control of the newspaper" and instead credited the testimony of one employee that "the union campaign was not part of an effort to let the reporters rather [than] management control the content of the newspaper." Having decided that First Amendment rights did not come into play, the ALJ found that the News-Press failed to establish that it would have taken the same actions even if the employees had not engaged in protected union activities.

The parties each filed numerous objections to the ALJ's recommended decision and order. The case remains pending before the Board.

The Regional Director had previously requested permission from the Board to file a Section 10(j) petition seeking an injunction against the News-Press. The Board denied this request on June 15, 2007. On December 20, 2007, the then four-member Board, anticipating that it would soon have fewer than the three members needed for a quorum, *see* 29 U.S.C. § 153(b), entered a temporary delegation order. Through this order, which became effective on December 28, 2007, the Board gave the General Counsel full "authority on all court litigation matters that otherwise would require Board authorization." NLRB Press Release R-2653 (Dec. 28, 2007).[3]

---

[3]A copy of the press release may be found at http://www.nlrb.gov/ shared_files/Press Releases/2007/R-2653.pdf (last checked December 30, 2009).

Specifically, the Board temporarily delegated to the General Counsel "full and final authority and responsibility on behalf of the Board to initiate and prosecute injunction proceedings under Section 10(j)." *Id.*

Over two months after this delegation of authority became effective, and despite the Board's initial refusal to authorize the petition, the Regional Director filed a Section 10(j) petition for a temporary injunction on March 6, 2008.[4] This petition sought an injunction compelling the News-Press, among other things, to offer interim reinstatement to each of the eight terminated employees.

The district court denied the petition for Section 10(j) relief on May 22, 2008. *McDermott*, 2008 U.S. Dist. LEXIS 94596. The court held that the requested injunction, "in its entirety," posed "a significant risk of violating [the News-Press's] First Amendment rights" since the "employees' Union-related activity had as a central demand the ceding of an aspect of [the News-Press's] editorial discretion." *Id.* at *16, 22. Accordingly, the district court applied the heightened burden for obtaining relief set forth in *Overstreet ex rel. NLRB v. United Brotherhood of Carpenters and Joiners of America*, 409 F.3d 1199 (9th Cir. 2005). Considering the "traditional equitable criteria" for interim injunctive relief and the First Amendment implications of the petition, the district court concluded that the Regional Director fell short of establishing that relief would be "just and proper" and therefore denied the Section 10(j) petition. *McDermott*, 2008 U.S. Dist. LEXIS 94596, at *39-48.

The Regional Director timely appealed the district court's decision.

---

[4]Because we affirm the district court's denial of Section 10(j) relief on other grounds, it is not necessary for us to reach the parties' arguments concerning the legality of the Board's delegation of its power.

## II.  Discussion

We apply the same standard of review to the district court's denial of relief under Section 10(j) as we would to the denial of any other preliminary injunction. *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir. 1994) (en banc). Accordingly, we will reverse the denial of Section 10(j) injunctive relief "only where the district court abused its discretion or based its decisions on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* Whether the district court applied the correct legal standards is reviewed de novo. *Id.*; *see also Overstreet*, 409 F.3d at 1204.

**[1]** Ordinarily the NLRB enjoys primary jurisdiction over labor disputes, subject only to narrow judicial review. *See Miller*, 19 F.3d at 458. Section 10(j) of the NLRA, however, permits the NLRB to petition a federal district court "for appropriate temporary relief or restraining order" pending the Board's resolution of an unfair labor practice charge. 29 U.S.C. § 160(j). The district court is given authorization to grant "such temporary relief or restraining order as it deems just and proper," *id.*, keeping in mind that the underlying purpose of Section 10(j) is "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller*, 19 F.3d at 459-60.

**[2]** To decide whether granting a request for interim relief under Section 10(j) is "just and proper," district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction. *See id*. at 456. In evaluating the validity of the district court's analysis of the equitable factors, we must employ the Supreme Court's recent interpretation of the threshold showing necessary for granting such an "extraordinary remedy." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374-76 (2008). Our now defunct precedents had provided "that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary

injunction may be entered based only on a 'possibility' of irreparable harm." *Id.* at 375; *see, e.g.*, *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 661 (9th Cir. 2001) (using this standard in evaluating Section 10(j) petitions for injunctive relief). Shunning the more lenient standard adopted by our circuit, the Supreme Court in *Winter* held that a party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 129 S. Ct. at 374. "To the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

**[3]** In *Overstreet*, a case decided before *Winter*, we held that a higher bar than usual is set for those seeking injunctive relief pending a Board decision in instances where "there is at least *some risk* that constitutionally protected speech will be enjoined."[5] 409 F.3d at 1208 n.13 (emphasis added). The NLRB's regional director in that case sought to enjoin members of a trade union from displaying banners that announced a labor dispute, alleging that the action constituted an unfair labor practice. *Id.* at 1201-02. We held in *Overstreet* that the significant First Amendment implications of enjoining peaceful speech activity meant the "ordinary principles of deference to Board interpretation of the Act d[id] not apply." *Id.* at 1207. Further, in light of the risk that protected First Amendment speech would be restrained, we concluded that "only a

---

[5]*Overstreet* involved a petition brought under Section 10(*l*), which makes it mandatory that regional officers file for injunctive relief whenever there is "reasonable cause" to believe a charge of certain NLRA offenses is true. 409 F.3d at 1205. Section 10(j), in contrast, gives the Board discretion (which in this case the Board delegated to the General Counsel) to decide whether to file for such injunctive relief. *Id.* The distinction between Section 10(*l*) and Section 10(j) petitions does not affect the standard a court must apply in assessing the propriety of a proposed injunction. *See id.*

particularly strong showing of likely success, and of harm . . . as well, could suffice" to justify issuing the requested injunction. *Id.* at 1208 n.13.

**[4]** We see no reason why *Overstreet*'s rule that a "particularly strong showing" is required to grant a Section 10(j) injunction when the proposed relief risks violating the First Amendment should not survive *Winter*'s change to our baseline preliminary injunction standard. Nothing in *Winter* conflicts with our requirement that those seeking such injunctive relief must establish particularly strong showings of likelihood of success and irreparable harm if there is some risk of offending First Amendment rights in the process. Nothing in *Overstreet* suggests that the heightened standard it announced for granting injunctive relief that risks licensing First Amendment violations was tied to the prevailing general preliminary injunction framework. *See Overstreet*, 409 F.3d at 1207-08 ("To say that *Miller* applies to this case does not . . . fully delineate the applicable standards for judging the propriety of the requested interim relief . . . because of the First Amendment backdrop in this case."). We hold, therefore, that *Overstreet*'s First Amendment precepts remain intact after *Winter*.

   A.  Overstreet's *Heightened Equitable Relief Standard Applies Here*

The Regional Director argues that the district court erroneously applied *Overstreet*'s elevated standard "because the record and the law establish that there is no risk of First Amendment infringement." The News-Press responds that the employees' central demand in their union campaign was for the News-Press to relinquish editorial control over the content of its news reports and that the employees backed up this demand with economic coercion, notably by urging readers to cancel their subscriptions. The News-Press maintains that "giving employees a protected entitlement under the imprimatur of the NLRA to apply economic pressure on the News-Press to cede editorial control" would create "a significant

risk of infringing upon the News-Press's First Amendment rights." We conclude that the district court correctly determined that granting the requested injunction would present at least some risk of compromising the News-Press's First Amendment right to exercise editorial control.

Recognizing the union's argument that enjoining its members from displaying banners about a labor dispute would be unconstitutional was "a plausible, and quite possibly meritorious one," *Overstreet* held that interpreting the NLRA to prohibit the union's activity would pose a "significant risk" of violating the First Amendment. 409 F.3d at 1211, 1212. Accordingly, applying the constitutional avoidance principle of statutory construction, we interpreted the NLRA so as not to prohibit the conduct at issue. *See id.* at 1210-12. Since the Board could not establish the pre-*Winter* "irreducible minimum" showing of "a fair chance of success on the merits," we affirmed the district court's denial of interim relief. *Id.* at 1207, 1216, 1219 (internal quotation marks omitted).

**[5]** Resolving whether *Overstreet*'s heightened equitable standard for awarding Section 10(j) relief controls here does not require us to "decide whether the First Amendment *does* protect the [News-Press's challenged activity], or even whether it probably does." *Id*. at 1209. Rather, we need only determine whether granting the Regional Director's injunction request would create "at least some risk that constitutionally protected speech will be enjoined." *Id.* at 1208 n.13. "[B]ecause constitutional decisions are not the province of the NLRB (or the NLRB's Regional Director or General Counsel), the tasks of evaluating the constitutional pitfalls of potential interpretations of the [NLRA] . . . are committed *de novo* to the courts." *Id.* at 1209.

Newspapers are not entitled to blanket immunity from general regulations, and the NLRA's prohibition on deterring union activity is no exception. In *Associated Press v. NLRB*, 301 U.S. 103 (1937), the Supreme Court considered an order

by the NLRB directing the Associated Press to stop penalizing its employees for engaging in union activity and to reinstate an editor whom the NLRB found was fired because of his union activity. *Id.* at 124. The Court upheld the NLRB's order and rejected the AP's contention that it must have "absolute and unrestricted freedom to employ and to discharge" news editors at will, observing that "[t]he business of the Associated Press is not immune from regulation because it is an agency of the press." *Id*. at 131, 132.

The Court did not hold, however, that First Amendment concerns were entirely irrelevant and should always be set aside in the face of an NLRB order. To the contrary, the Court emphasized that enforcement of the order at issue there had "no relation whatsoever to the impartial distribution of news." *Id.* at 133. The Court explicitly noted that the order did not in any way "circumscribe[ ] the full freedom and liberty of the [AP] to publish the news as it desires it published or to enforce policies of its own choosing with respect to the editing and rewriting of news for publication."**[6]** *Id.* With this caveat, the Court signaled that application of regulations that restricted those press liberties could be constitutionally problematic. *See Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984) ("The Court implied [in *Associated Press*] that should the press's freedom and liberty 'to publish the news as it desires it to be published' be circumscribed, the [NLRA] would have to yield to the First Amendment.").

**[6]** It is clear that the First Amendment erects a barrier against government interference with a newspaper's exercise of editorial control over its content. Elaborating on the consti-

---

**[6]**The Court's decision did not discuss the specific motivation of the employees in that case for supporting the union. It may be inferred that it was the more usual concern of employees for wages and hours. That is confirmed by the underlying decision of the NLRB, which referred to the lowering of wages in the industry during the Depression, and the AP's replacement of a five-day work week with a six-day work week. *The Associated Press*, 1 NLRB 686, 691, 693 (1936).

tutional guarantees afforded to newspaper publishers, the Supreme Court has explained:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press . . . .

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 136 (9th Cir. 1971) (holding private newspapers cannot be compelled to publish advertisements free from editorial control of their content). The Court in *Tornillo* thus struck down a state statute that forced newspapers to publish a political candidate's reply to stories criticizing the candidate, holding that such a law impermissibly intrudes on a newspaper's right to choose what to print. *See Tornillo*, 418 U.S. at 257-58.

Following *Tornillo*, the D.C. Circuit declined to enforce part of an NLRB order requiring a newspaper to reinstate a columnist found to have been discharged for engaging in union activity and to resume printing his weekly column subject to lawful employment and publication standards. *Passaic Daily News*, 736 F.2d at 1556-59. *Passaic* deemed the NLRB's order constitutionally defective because it "invites the Board to review the Company's publication standards and to become directly involved with the Company's exercise of editorial control and judgment." *Id.* at 1559. According to the court, "[a]n order that merely directed the Company to not

discriminate against [the fired columnist] on the basis of his union activity would present a much closer case."[7] *Id.*

The district court noted that the proposed injunctive relief in this case is "more indirect" than the orders at issue in *Tornillo* and *Passaic Daily News*, because it would not "force publication of specific content," as did the orders in those cases. *McDermott*, 2008 U.S. Dist. LEXIS 94596, at *28.[8] Nonetheless, it concluded that the requested injunction would burden the exercise of editorial discretion by the News-Press. *Id.* at *28-29. It specifically found that the "employees' Union-related activity had as a central demand the ceding of an aspect of [the News-Press's] editorial discretion." *Id.* at *22. The district court further found that the employees sought to force the News-Press to give in to their union-backed demand for the relinquishment of editorial control through economic pressure tactics. *Id.* at *22-23. These findings of fact are not clearly erroneous and are supported by the record. *See supra* at 1453-55.

The union organizing campaign arose in the wake of an extended dispute between the News-Press management and newsroom employees regarding allegedly biased reporting and newspaper content. The first of the four demands was for the News-Press to "[r]estore journalism ethics to the [newspaper]: implement and maintain a clear separation between the opinion/business side of the paper and the news-gathering side." This demand reflected the belief of some news reporters that there had been a "breakdown of a 'wall' that should

---

[7]On remand, the Board called for the columnist to be restored to his prior position with no guarantee that his columns would be published. *Herald News*, 276 NLRB No. 78 (1985). This later order was not challenged.

[8]The ALJ's decision cites the cancellation by the News-Press of a column written by a union supporter as an unlawful unfair labor practice, an approach which appears in conflict with *Passaic Daily News*, but the ALJ did not go so far as to recommend ordering restoration of the column because the employee subsequently resigned.

separate [the publisher's] control of the opinion pages of the newspaper from control over the news reporting pages." Melinda Burns, one of the lead Union organizers and one of the terminated employees whose reinstatement would be ordered by the proposed injunction, testified:

> To keep its credibility, a newsroom has to have independence from the editorial side of the paper . . . . The editorial side is the opinion side. The publisher's opinion is in the editorials. The news side has to have the independence and freedom to report the news, gather the news . . . and not to be pressured by the publisher to report it or gather it in a certain way.

She wanted, in short, to be "able to report the news as truthfully as I can and as fairly as I can *without a publisher telling me how to write it*." (emphasis added). The employees' content-specific demand was repeated at various Union-led demonstrations leading up to the Union election.

**[7]** The cancellation drive was also tied to the employees' desire for editorial independence from management. Pledge cards specifically asked recipients to support the "newsroom staff in its effort to restore journalistic integrity to the paper" by cancelling their subscriptions. This history persuades us that the employee-initiated union campaign aspired in large part to compel the publisher of the News-Press to relinquish to the newsroom staff editorial control over the reporting of the news, which lies at the core of a newspaper's First Amendment rights.

**[8]** Under these circumstances, as the district court aptly observed, it "does not seem possible to parse, at least in the manner the ALJ sought to do, [the newspaper's] animus toward the Union generally from its desire to protect its editorial discretion. The motives necessarily overlapped in this case." *McDermott*, 2008 U.S. Dist. LEXIS 94596, at *37. We agree.

We also observe that the ALJ appeared to believe that the fact that "editorial integrity" was a proper subject for collective bargaining supported a conclusion that First Amendment rights were not at issue. That simply does not follow, and the qualifications drawn by the Supreme Court in *Associated Press* indicate otherwise. That employees may want to bargain collectively over a given subject does not necessarily mean that there can be no First Amendment implications. The rights of employees to organize and engage in collective bargaining may, understandably, be the primary focus and concern of the NLRB, but they do not supersede the First Amendment. As we noted in *Overstreet*, 409 F.3d at 1209, we owe no deference to the administrative agency's view of the First Amendment.

**[9]** Deploying the NLRA to protect the employees' efforts in support of the Union would risk "circumscrib[ing] the full freedom and liberty of [the News-Press] to publish the news as it desires it published [and] to enforce policies of its own choosing with respect to the editing and rewriting of news for publication." *Associated Press*, 301 U.S. at 133. The injunction the Regional Director seeks here would prevent the News-Press from taking action against employees for engaging in activities calculated to pressure the News-Press into limiting its exercise of editorial discretion. We conclude that the requested interim relief would risk violating the News-Press's constitutionally protected editorial discretion by removing an otherwise available weapon to resist employees' attempts to seize control over the newspaper's content. *See Tornillo*, 418 U.S. at 256 ("Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers.").

**[10]** We do not pass judgment on the validity of the employees' concerns with respect to journalistic integrity. We cannot, however, ignore the Supreme Court's teaching on the subject: "A responsible press is an undoubtedly desirable

goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." *Id.* No matter how laudable the goals of the fired reporters in promoting the Union to, as the ALJ put it, "restore journalistic integrity," the risk that granting an injunction will infringe the News-Press's right to publish what it pleases is inescapable. *See id.* (declaring that any "compulsion exerted by government on a newspaper to print that which it would not otherwise print" is unconstitutional); *see also Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."). For that reason, we conclude that the district court did not err in concluding that the additional requirements of *Overstreet* must be met in evaluating whether to grant the Section 10(j) petition.

The dissenting opinion concludes that the proposed injunction does not pose a significant risk of infringing the First Amendment because it does not directly "require the paper to change its editorial policy" or "dictat[e] what a newspaper must publish." *Infra* at 1479, 1480. We think that approach closes its eyes to what the underlying labor dispute here is about: the ability of the newspaper owner and publisher to exercise control over the news pages of the News-Press. *See Tornillo*, 418 U.S. at 259 (White, J., concurring) ("[T]he First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned."). Intervening to support the employees' effort to limit the control of the News-Press's owner over its news pages necessarily poses some risk to that owner's First Amendment rights. *See Pacific Gas & Electric Co. v. Public Utilities Com.*, 475 U.S. 1, 33 (1986) ("[I]nterference with the exercise of editorial control and judgment creates a peril for the liberty of the press like government control over what is to go into a newspaper." (internal quotation marks omitted)); *see also Regan v. Taxation With Representation of Washing-*

*ton*, 461 U.S. 540, 553 (1983) (Blackmun, J., concurring) ("It hardly answers one person's objection to a restriction on his speech that another person, outside his control, may speak for him."); *Tornillo*, 418 U.S. at 258 (observing that "[a] newspaper is more than a passive receptacle or conduit for news, comment, and advertising" and holding that government action "fails to clear the barriers of the First Amendment" when it "intru[des] into the function of editors.")).

Telling the newspaper that it must hire specified persons, namely the discharged employees, as editors and reporters constituting over 20 percent of its newsroom staff is bound to affect what gets published. To the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 572-73 (1995) (holding that because "every participating . . . unit affects the message conveyed by [a parade's] private organizers," a state court's interpretation of a law to require inclusion of one group of prospective marchers "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message"); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978) ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue.").

The dissenting opinion also contends that the First Amendment rights of the News-Press and its owner would be unaffected because the newspaper would be free to operate as it did before, without change. But that assumes that the Union's efforts to effect a change will fail. It is surely not the premise of the ALJ's decision or the proposed injunction that the newspaper owner will prevail and that the employees' efforts are bound to be for naught. There would be no point to requesting or ordering interim relief here unless it was expected to have an impact. The proposed injunction is aimed

at strengthening the Union's hand against the owner, and that will impair the owner's right to control the newspaper's content. It may be true, as the dissenting opinion states, *infra* at 1483, that "[t]here is no more reason to expect the News-Press would be forced to agree to reestablish a firewall than to expect it to be forced to capitulate to employees' other contract demands." But employers are regularly forced by unions to capitulate to more traditional wage and hour demands. *See NLRB v. Trimfit of California, Inc.*, 211 F.2d 206, 208-209 (9th Cir. 1954) (affirming an NLRB order requiring reinstatement of pro-Union former employees); *see also* 29 U.S.C. § 157 (codifying the rights of employees "to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining *or other mutual aid or protection*") (emphasis added). The risk of that happening is far from zero.

First Amendment rights are not jeopardized when it comes to those wage and hour demands — a newspaper is not protected by the First Amendment against having to pay more money to its reporters — but freedom of the press is jeopardized when the employees' primary demand is for the publisher to cede control of her newspaper's content. In sum, we do not share the view of the dissenting opinion that the News-Press's ability to control its content would not be put in at least some risk by the requested injunction. As a result, we agree with the district court that *Overstreet*'s heightened equitable relief standard applies.

B.  *The District Court Did Not Abuse Its Discretion in Finding the Equities Did Not Weigh in Favor of Granting Relief*

The district court concluded that the Regional Director failed to meet the heightened burden for interim relief, given the First Amendment concerns it identified. Though the district court may have been guided by the "too lenient" preliminary injunction standards of our pre-*Winter* cases, we will not

disturb its denial of relief unless the denial itself constituted an abuse of discretion.[9] *See Am. Trucking Ass'n*, 559 F.3d at 1052 ("The district court applied our pre-*Winter* approach, but because it denied relief that, itself, does not require reversal."). If we would affirm the denial of an injunction under our prior standard, we would necessarily affirm the denial of that injunction under the more stringent *Winter* standard. *Cf. Johnson v. Couturier*, 572 F.3d 1067, 1084-85 (9th Cir. 2009) (affirming the grant of injunctive relief "[a]lthough the validity of the district court's approach [was] questionable post-*Winters*," when its analysis impliedly supported the necessary finding of irreparable harm).

In light of the First Amendment issues in this case, we conclude that the district court did not abuse its discretion by declining to grant preliminary injunctive relief. The standard for such relief is a tough one, taking into account *Overstreet*'s increased demands. *See* 409 F.3d at 1208 n.13 ("[W]here, as here, there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice."); *see also Miller*, 19 F.3d at 460-61 ("Where the Board and the respondent each make a showing of hardship, the district court must exercise its sound discretion to determine whether the balance tips in the Board's favor."); *accord Winter*, 129 S. Ct. at 376 ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested [injunctive] relief.") (internal quotation marks omitted).

We start the analysis, as did the district court, by considering the likelihood of success. In this case, success for the

---

[9]Given the district court's application of *Overstreet*'s raised bar for preliminary injunctive relief (which applies post-*Winter* as well), it is not clear whether the standard applied was actually more lenient than the one announced in *Winter*, which did not address any First Amendment concerns.

Regional Director is defined by whether the Board would adopt the findings and recommendations of the ALJ and whether, in that event, our court would conclude that the Board's order should be enforced.

As a preliminary matter, we note that we do not presume that the Regional Director's position will ultimately be adopted by the Board. A Board itself deciding to file a Section 10(j) petition might signal its future decision on the merits, assuming the facts alleged in the petition withstand examination at trial. *See Overstreet*, 409 F.3d at 1207 n.12. In this case, however, the Board initially declined to file a petition for relief. It was only after the Board delegated its authority to its General Counsel that a petition for interim relief was actually filed. *See id.* (remarking that since regional directors determine whether to file Section 10(*l*) petitions such filings "suggest[ ] nothing about how the Board will ultimately resolve the case"). The fact that "the General Counsel issued a complaint and an ALJ ruled in favor of the General Counsel by no means foreordains the Board's decision." *Id.*

**[11]** For the most part, the district court appeared to address the factors relevant to the question of likelihood of success within its discussion of *Overstreet*'s application in light of the First Amendment interests implicated by the requested relief. Having already concluded that the First Amendment rights of the News-Press were at risk of being infringed, the district court simply concluded that "it [could not] find that [the Regional Director] has such a strong likelihood of success as to presume irreparable harm." *McDermott*, 2008 U.S. Dist. LEXIS 94596, at *41. As revealed in its discussion of the subsequent factors, the most the district court appeared willing to grant the Regional Director's position was the unexplored possibility that it presented "serious questions going to the merits." *Id.* at *45. Under *Winter*, of course, that would not be enough to support the entry of a preliminary injunction, regardless of the other factors. As suggested in our own discussion of *Overstreet* above, we conclude that the district

court did not abuse its discretion in this portion of its evaluation.

**[12]** The next element to be considered is irreparable harm. The Regional Director contends that a failure to grant the requested injunction will result in irreparable harm to the discharged employees and the Union's collective bargaining efforts. The district court concluded, however, that entering a preliminary injunction would not actually make much difference, primarily due to the passage of time. Specifically, the court found "little basis to believe, given the long delay, that an interim order at this point will provide any genuine reassurance to employees beyond that provided by a final Board order that unfair labor practices committed by [the News-Press] will be timely remedied." *Id.* at *44-45. We do not disagree with that assessment.

We note that "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds by Miller*, 19 F.3d 449. The factor of delay "is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Id.* Most of the delay in this case has resulted from the time taken by the litigation process itself, and the Regional Director cannot be faulted for that. But at least some of the delay was caused by the Regional Director's deferred petition for preliminary injunctive relief.

Among other measures, the Regional Director requests reinstatement of eight employees who were discharged between October 2006 and February 2007. The Section 10(j) petition requesting the employees' interim reinstatement was not filed until March 2008, some 13 to 17 months after the employees were discharged. The Regional Director asserts that the decision to seek Section 10(j) authorization was prudently postponed until the ALJ issued its decision, but in June

2007, two months before the hearing before the ALJ, the Board refused the Regional Director's request for permission to bring a Section 10(j) petition in this case. The Board's temporary delegation of authority to the General Counsel to initiate Section 10(j) proceedings became effective just two days after the ALJ's decision was issued. The Regional Director waited over two months after that to file the instant petition.

Under the circumstances, it is not apparent to us that the district court was wrong in concluding that a preliminary injunction would not actually make a practical difference here. At this point, the parties appear to be waiting for the Board's adjudication. It seems unlikely that a final order of the Board would be any less effective as a result of the denial of interim relief.

[13] Moving to the balance of hardships, the district court concluded that the balance did not tip sharply in favor of granting equitable relief, again applying the pre-*Winter* standard under which preliminary injunctive relief could be supported by serious questions on the merits plus a strong showing of irreparable harm and a sharp tipping of the balance of hardships. We are not entirely confident that the district court gave appropriate weight to the rights of the discharged employees in weighing this balance, because it appeared to express equal concern for what would happen to the jobs of employees hired by the News-Press to replace the discharged Union members. The rights of improperly discharged employees, assuming they were in fact wrongfully terminated, are superior to those of their replacements. *Aguayo*, 853 F.2d at 750. Primarily, though, the district court focused on what is, in fact, the primary conflict here: the rights of the employees to organize versus the right of the newspaper to exercise and defend what it asserts are its First Amendment rights. We agree with the district court's determination that the Regional Director has not made a showing that

the balance of hardships tips in his favor to the degree that would be necessary to support the interim relief sought here.[10]

## III.   Conclusion

In sum, we affirm the district court's denial of the Regional Director's Section 10(j) petition for interim relief. The factual findings on which its decision rests are not clearly erroneous. The district court correctly applied *Overstreet*'s increased demands given the First Amendment concerns at issue and did not abuse its discretion in concluding that relief was not "just and proper" based on its assessment of the traditional equitable factors.

**AFFIRMED.**

---

HAWKINS, Circuit Judge, Dissenting:

The majority relies on cases in which the party seeking an injunction was attempting to enjoin *speech*, claiming the result here necessarily follows from cases (1) reviewing a decision forcing a union to cease expressing its views through bannering, *Overstreet v. United Bhd. of Carpenters, Local Union No. 1506*, 409 F.3d 1199, 1203 (9th Cir. 2005), (2) seeking to compel a newspaper to publish content from a political candidate, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 243 (1974), or (3) reviewing an order requiring a newspaper to resume publishing a weekly column to which it objected, *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1548

---

[10]The district court did not separately discuss the fourth factor subsequently identified by the Supreme Court in *Winter*, the public interest. 129 S. Ct. at 374. A strong claim can be presented on behalf of the right of employees to organize and bargain collectively, but, as noted above, that right does not trump the First Amendment, so it cannot justify entry of a preliminary injunction that was denied by the district court based on consideration of the other factors.

(D.C. Cir. 1984). In other words, the majority finds the grounds for its conclusion in cases seeking to enjoin or compel speech or its content.

This is not such a case. The injunction here only seeks reinstatement for terminated employees. Period. It does not enjoin speech. Rather, the injunction addresses troublesome, retaliatory terminations and disciplinary actions the News-Press took *only after union organizing began*. The injunction addresses terms and conditions of employment, and it leaves the News-Press's right to publish its desired content entirely intact.[1] Under the injunction, the News-Press was and is per-

---

[1] The proposed injunction reads as follows:

[The News-Press shall] Cease and desist from:

(a) Discharging employees for engaging in Union or other protected concerted activities;

(b) Informing employees that they will be suspended for engaging in Union or other protected concerted activities;

(c) Retaliating against employees for engaging in Union or other protected concerted activities by inter alia giving them poor work evaluations;

(d) Threatening employees with discipline and discharge if they engage in peaceful employee conduct, such as employee delegations;

(e) Prohibiting employees from wearing buttons with protected messages, such as "McCaw, Obey the Law";

(f) Prohibiting employees from displaying signs with protected messages, such as "McCaw, Obey the Law";

(g) Coercively interrogating employees, verbally or in writing, concerning their Union or other protected activities;

. . .

Take the following affirmative action:

(a) Within five days of the issuance of this Order, offer interim reinstatement to [the eight fired employees] to their former job positions and working conditions, or if those job positions no longer exist, to substantially equivalent positions without prejudice

fectly free to insist on total editorial control in labor negotiations, leaving it able to lockout employees who do not agree to such terms.

The News-Press sees this case as one in which it may have to withstand economic pressure from its employees who are unhappy with the paper's management. Exerting such pressure is the very essence of union activity. "[T]he reason for labor organizations . . . [is] to give laborers opportunity to deal on an equality with their employer." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). Where, as here, an injunction does not implicate First Amendment concerns, this core purpose of the National Labor Relations Act ("NLRA") is properly protected through a section 10(j) injunction when organizing employees are fired because of their union activities.

Three facts are critical here. First, this case is not about the six editors and reporters who resigned citing editorial differences with the News-Press. It is about the eight newsroom employees who responded to what they saw as arbitrary management by seeking union protection, and were then fired for their union activities. Second, only *after* the fired employees engaged in the protected union activity did the News-Press bring any issue regarding their alleged "bias" or "disloyalty" to the employees' attention or note such issues in their person-

---

to their seniority or other rights and privileges previously enjoyed, displacing, if necessary, any newly hired or reassigned workers;

(b) Within five days of the issuance of this Order, rescind and remove from the personnel files of [the eight fired employees] any reference to their discharges, pending the final decision of the Board;

(c) Within five days of the issuance of this Order, rescind and remove from all personnel files any reference to warnings or notices of suspensions given to any employee for participating in the employee delegation . . . .

nel files. Third, examining these facts in a thoughtful, 75-page opinion, following a 17-day trial, the ALJ concluded the News-Press committed numerous unfair labor practices, and the employees' union activities prompted the News-Press's challenged actions. The ALJ thus recommended relief, including reinstatement of the eight discharged employees.

## A.    Deference to the Board

The majority's opinion turns in part on finding *Overstreet* controlling. Maj. Op. 1461, 1468, 1475. However, beyond the magic words of "the National Labor Relations Act" and "the First Amendment," the facts of *Overstreet*, a secondary boycott case, are fundamentally different.[2]

In *Overstreet*, the outcome turned in part on whether the union's bannering activities constituted "threaten[ing], coerc-[ing], or restrain[ing] any person engaged in commerce" under Section 8(b)(4)(II) of the NLRA. The opinion characterized those words as "vague" and their application as "far from self-evident." *Overstreet*, 409 F.3d at 1212. Given this ambiguity, the court inquired into whether the Board's "proposed construction of the Act 'would give rise to serious constitutional questions'" and therefore require construing ambiguous statutory language to avoid such questions. *Id.* at 1209 (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979)). *Overstreet* held "serious constitutional questions" are implicated where an injunction would present "a significant risk that the First Amendment will be infringed" even without deciding whether the proposed injunction would actually violate the First Amendment. *Id.* (quoting *Catholic Bishop of Chicago*, 440 U.S. at 502). Because one permissible

---

[2]I agree with the majority's statement that there is "no reason" the analysis from *Overstreet* should not survive the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008), but this does not alter my conclusion that the majority is incorrect to apply the Overstreet analysis here.

interpretation of Section 8(b)(4)(II) avoided those questions and the risk of infringing the First Amendment, the court applied the uninfringing interpretation. *See id* at 1209-10.

Unlike *Overstreet*, here, the NLRA's protections of employees' rights to "assist labor organizations" and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" clearly apply to media employees, because the Supreme Court has held an agency of the press has no "special immunity" from application of the NLRA or any general law. *Associated Press v. NLRB*, 301 U.S. 103, 132-33 (1937); *see* 29 U.S.C. § 157 (NLRA Section 7).

Section 8's declaration of an unfair labor practice when employers "interfere with, restrain, or coerce employees in the exercise" of Section 7 rights "by discrimination in regard to hir[ing] or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," as the ALJ found the News-Press did here, unambiguously applies. *See* 29 U.S.C. § 158(a). Therefore, the *Overstreet* standard should not guide the present outcome, and "the Board's determination on the merits will be given considerable deference." *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994).

Finding the *Overstreet* standard inapplicable is further buttressed by comparing its facts to this case. In *Overstreet*, the Board sought an injunction prohibiting union bannering of retail stores selling products from firms with which the union had a labor dispute, pending NLRB resolution of the complaint. *Overstreet*, 409 F.3d at 1203. The injunction thus had direct bearing on the union's ability to continue its speech. That secondary-boycott situation bears no resemblance to the facts in this case, an organizing case in which pretextually terminated employees are seeking reinstatement. Indeed, the News-Press conceded at argument that the terms of the injunction do not require the paper to change its editorial pol-

icy, nor give employees the power to direct the editorial policy. *Overstreet* thus has no application to an injunction which simply does not implicate the First Amendment risk the News-Press alleges.

## B.   First Amendment Concerns

The News-Press argues the NLRA should yield to First Amendment protections accorded the press in this case because of a publisher's total discretion to determine the contents of its newspaper. The majority follows suit, noting "the employee-initiated union campaign aspired in large part to compel the publisher of the News-Press to relinquish" editorial control over its free "reporting of the news." Maj. Op. 1466. The News-Press contends that unlike *Associated Press*, where the AP sought a blanket entitlement to discharge the employee, this case directly concerns the full freedom and liberty of a newspaper to publish the news as it desires and to control the editing and rewriting of news for publication. Put another way, the News-Press, and the majority, find distinguishing between an injunction reinstating employees, and an order dictating what a newspaper must publish, a distinction without a difference. I disagree.

The ALJ found all eight employees were fired because of their union activities and the News-Press's allegations of biased reporting pretextual.[3] As in *Associated Press*, therefore, this case does not present the question of whether Congress has the power to interdict an employee's discharge if a newspaper "believed its policy of impartiality was likely to be subverted by [an employee's] continued service." 301 U.S. at 132. Unlike the order requiring a newspaper to reinstate a columnist and resume publication of his weekly column at issue in *Passaic*, 736 F.2d at 1558-59, the injunction the Regional

---

[3]These fact-intensive determinations are generally entitled to deference. *See, e.g.*, *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 337-38 (2d Cir. 1999).

Director sought here would only have required the News-Press to rehire reporters, leaving intact all of its policies and procedures related to article publication and editorial approval process. On remand after *Passaic*, an order requiring the newspaper to restore the columnist to his position and "decide whether to publish his submissions based upon any factors other than his union or protected activity" went unchallenged. *Herald News*, 276 NLRB 605, 606 (1985).

Indeed, as the district court acknowledged, the injunctions at issue in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. at 243, *and Passaic* "sought in some fashion to force publication of specific content by the newspapers at issue, thus actually directing the publishers' exercise of their editorial discretion," whereas the injunction sought in this case "seeks to prevent Respondent only from disciplining its employees who engaged in activities aimed to pressure it into limiting its exercise of its editorial discretion." *McDermott ex rel. NLRB v. Ampersand Publ'g LLC*, 2008 U.S. Dist. LEXIS 94596, at *28 (C.D. Cal. May 21, 2008). The district court nevertheless concluded that because "these demands were not mere requests but were instead backed by public concerted activity placing economic pressure on [the News-Press] to acquiesce," "the sought after injunction amounts to state action limiting Respondent's ability to combat pressure placed on it to limit its exercise of editorial discretion." *Id.* at *28-29.

The News-Press argues along similar lines, claiming it has a First Amendment right to discharge its employees notwithstanding any provision of the NLRA because of their collective advocacy of a boycott directed, in part, toward forcing the News-Press to reestablish certain journalistic standards. Citing *Newspaper Guild, Local 10 v. NLRB*, 636 F.2d 550 (D.C. Cir. 1980), the district court accepted this argument, noting the D.C. Circuit required the Board to strike a balance "between an employer's freedom to manage his business in areas involving the basic direction of the enterprise and the right of employees to bargain on subjects which affect the terms and

conditions of their employment." *Ampersand*, 2008 U.S. Dist. LEXIS 94596, at *31 (quoting *Newspaper Guild*, 636 F.2d at 562). Citing the inapposite *Tornillo* opinion, the majority similarly concludes the injunction here would "remov[e] an otherwise available weapon to resist employees' attempts to seize control over the newspaper's content." Maj. Op. 1467.

Contrary to these assertions, the Director has not sought to force the News-Press to capitulate to its employees' demands. In fact, unlike in *Newspaper Guild*, the Director has not even ordered the News-Press to bargain over these demands in good faith. *Cf. Newspaper Guild*, 636 F.2d at 557. The proposed injunction would allow the News-Press to continue to operate without a "firewall" between the editorial and news departments if it so chose. It would also leave the News-Press with complete editorial control, including what kind of opinion pieces, if any, to publish in relation to its disputes with its employees. The News-Press and the majority are essentially arguing for a newspaper's First Amendment right to be free from its employees' public criticism of its practices because their criticism (and call for a boycott) is "coercive."[4] The

---

[4]As support for this claim, the majority cites the statements of Melinda Burns ("Burns"), who was wrongfully fired for her union activities, suggesting her view that "a newsroom has to have independence from the editorial side of the paper" demonstrates the First Amendment issues at stake in this case. Maj. Op. 1466. But, despite the majority's assertion that my "approach closes its eyes to what the underlying labor dispute here is about," Maj. Op. 1468, clearly I do not presume to suggest Burns can dictate to the News-Press what editorial standards it must employ. The First Amendment unquestionably protects that determination. Nor do I doubt that the editorial concern was a subject of the employees' bargaining. The NLRA cannot grant employees the power to insist upon conditions on a newspaper's content. The statute can, however, provide Burns, and similarly situated employees, the ability to at least discuss those standards in collective bargaining, free from the Damocles' sword of retaliatory termination. The News-Press, of course, also remains free to reject such requests, insisting on its rights to publish its paper as it sees fit. Contrary to the majority's assertions, Maj. Op. 1468-71, that right, protected for the News-Press by the First Amendment, is not implicated on the facts of this case.

News-Press argues it must be free to respond to this "economic coercion" with discharge or other economic weapons of its own or else it will have no choice but to capitulate.

In concluding "[t]he injunction the Regional Director seeks here would prevent the News-Press from taking action against employees," Maj. Op. 1467, the majority proves too much. A "company always has the legal right to discipline an employee in a nondiscriminatory fashion for improper conduct. Further, any company subject to a § 10(j) injunction is theoretically subjected to the risk of which [the News-Press] complains." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996).

In addition, employees generally may advocate "a boycott of the employer's product, as long as the boycott is tied to a labor dispute and does not disparage the employer's product." *Firestone Tire & Rubber Co.*, 238 NLRB 1323, 1324 (1978), *enforced*, 651 F.2d 1172 (6th Cir. 1980). Consumer boycotts pressure, but do not compel, targeted employers to capitulate to employees' demands, whether those demands relate to traditional compensation matters or to other "terms of employment." There is no more reason to expect the News-Press would be forced to agree to reestablish a firewall than to expect it to be forced to capitulate to employees' other contract demands. Employees who desire to bargain over policies related to journalistic integrity should not thereby be stripped of their Section 7 rights. Even if, as in *Newspaper Guild*, a balancing "between an employer's freedom to manage his business . . . and the right of employees to bargain" were required, 636 F.2d at 562, an employer's desire to be free from public criticism of its practices is not equivalent to its First Amendment right to choose what to publish on its pages. It thus does not outweigh employees' NLRA rights to protest or bargain over the conditions of their employment.

Given the limited scope of the injunction and the employees' clear right to organize, there is no significant risk of a

First Amendment infringement due to the requested relief, and, therefore, the criteria for considering the injunction should have been applied with the typical deference to the Board. *See Miller*, 19 F.3d at 460-61.

## C.   Balancing of Equitable Criteria

By necessity, the granting of injunctive relief requires adjustment of the parties' rights without full adjudication of the facts. Yet here we benefit from the ALJ having created a substantial factual record to overlay against "the requirements of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). When "determining whether interim relief under 10(j) is 'just and proper,' district courts should consider traditional equitable criteria . . . through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller*, 19 F.3d at 459-60.

In *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court clarified the traditional equitable criteria, explaining a party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 129 S. Ct. 365, 374 (2008).[5]

---

[5]In doing so it rejected our previous standard allowing injunctive relief on a showing of a "possibility" of irreparable injury. *E.g.*, *Natural Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008). I follow the majority in assuming without deciding that the Supreme Court's decision in *Winter* alters our previous statements in *Miller* of the showing a party must make to obtain injunctive relief under section 10(j). I also see no reason why *Winter* disturbs our other statements in *Miller* instructing courts to consider the traditional equitable criteria against the backdrop of section 10(j)'s purpose.

Rejecting *Overstreet*'s applicability in this case, I would find the district court abused its discretion in denying the injunction. Though the district court was conscientious in its analysis, finding the Director unlikely to prevail on the merits was grounded in the erroneous legal premise that employees' attempts to negotiate aspects of the editorial process strip them of the NLRA's protection. With the proper protection and deference to the Board in place, the ALJ's findings show a clear likelihood of success on the merits, and the other equitable factors are met as well.

When concluding *Overstreet*'s standard of review does not apply, courts view the Director's probability of prevailing "in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference." *Miller*, 19 F.3d at 460. Here, the ALJ's extensive factual findings detail a variety of unfair labor practices orchestrated by the News-Press and include reasonable findings that key testimony offered on the News-Press's behalf was not credible and the justifications advanced for its actions were in large part pretextual.

Under the facts here there are multiple irreparable injuries due to the terminations and subsequent rejection of the injunction. "To permit illegal employer conduct to go unaddressed while the Board's corrective machinery grinds toward resolution would subvert the underlying purposes of section 10(j) and allow those who commit unfair labor practices to reap the benefits of that conduct." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 660 (9th Cir. 2001). Thus, unlawful, unremedied discharges create adverse impacts on employees' interests in union organizing, and the union's ability to bargain irreparably deteriorates as this situation is allowed to continue. *See Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001) ("[T]he discharge of active and open union supporters . . . risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process.") (internal quota-

tion marks omitted); *Electro-Voice, Inc.*, 83 F.3d at 1573 ("As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases.").

An unlawful discharge also causes the irreparable harm of removing union supporters from the workplace at the time when the union is in most need of support. *See Electro-Voice, Inc.*, 83 F.3d at 1573. Here, the longer the complaint sits with the Board without action, the weaker the union appears to remaining employees and the less energy exists in support of unionization, injuries that are immeasurable and irreparable.

The balance of hardships and the public interest also tip in favor of "ensur[ing] that an unfair labor practice will not succeed" because "declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Miller*, 19 F.3d at 460.

The majority puts significant emphasis on the Board's delay in filing an injunction, citing the passage of time as the only factor supporting its conclusion that denial of the injunction resulted in no irreparable harm. Maj. Op. 1473. Yet the majority's entire discussion of the Board's delay (and thus its entire discussion of irreparable harm) cites only one case, and in that case this court actually rejected the argument the majority recycles regarding the importance of the Board's delay in filing the injunction.

In *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds by Miller*, 19 F.3d at 455-56, we dismissed an argument made pursuant to the Fifth Circuit's decision in *Boire v. Pilot Freight Carriers, Inc.*, which, like the majority, found Board delay critical to denying an injunction, *see* 515 F.2d 1185, 1193 (5th Cir. 1975). We noted the delay argument was "not persuasive," stating "[d]elay by itself is not a determinative

factor in whether the grant of interim relief is just and proper." *Aguayo*, 853 F.2d at 750. Yet the majority references *Aguayo* and then proceeds to reason from the premise *Aguayo* rejected, claiming the Board's delay is so important here that it constitutes the entire irreparable harm analysis.

Perhaps the majority cites no cases for this proposition because we have specifically rejected the reasoning underlying an approach attaching such importance to Board delay. We have previously noted that the view *Boire* and the majority advance "actually hinders rather than protects the collective bargaining process" because " 'the underlying purposes of section 10(j) are to protect the integrity of the collective bargaining process and to preserve the [Board]'s remedial power while the Board resolves the unfair labor practice charge.' " *Scott*, 241 F.3d at 660 (quoting *Miller*, 19 F.3d at 452).

Other circuits, though recognizing the troublesome consequences of the Board's delay in filing an injunction, have agreed, distinguishing *Boire* and declining to attach dispositive weight to Board delay. *See, e.g.*, *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544-45 (4th Cir. 2009) (noting the troubling nature of the Board's 18-month delay in seeking an injunction, but finding the balance of harms, the likelihood of success on the merits, and the "strong public policy" favoring injunctive relief, supported an injunction); *see also Levine v. C & W Mining Co.*, 610 F.2d 432, 437 (6th Cir. 1979) (noting approaches contrary to *Boire* are "more in accord with the purposes of the Act").[6]

---

[6]Significant delay in the 10(j) process is not unique to this case and is, in fact, a common criticism leveled at the Board. *See, e.g.*, Catherine L. Fisk & Deborah C. Malamud, *The NLRB in Administrative Law Exile: Problems With its Structure and Function and Suggestions for Reform*, 58 Duke L.J. 2013, 2028 (2009) ("One criticism frequently leveled at the NLRA is that the relative mildness of the remedies (reinstatement plus back pay) and the slowness of the administrative process (it can take years

Though these cases show no excuse necessary, two related facts serve to justify the Board's delay in this case. Generally, the Board argues it was waiting for the ALJ to develop the administrative record to prevent the district court and the ALJ from simultaneous review. This efficiency justification could in some instances be sufficient to justify delay. *See Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 248-49 (3d Cir. 1998). In addition, the Supreme Court has recently granted certiorari in a case to resolve whether adjudicative decisions made by only two of the NLRB's five members are valid. *See New Process Steel, L.P. v. NLRB*, 564 F.3d 840 (7th Cir. 2009), *cert. granted*, 77 U.S.L.W. 3670 (U.S. Nov. 2, 2009) (No. 08-1457). Though the question in *New Process Steel* does not implicate the Board's authority here in its prosecutorial role, *see Muffley*, 570 F.3d at 540, the uncertain legal status of the NLRB, as the Supreme Court has recognized, provides further, reasonable justification for delays in decision making. This justification is particularly salient because, here, the delay in filing the section 10(j) injunction, after the ALJ's decision, occurred precisely when the cases questioning the Board's ability to act without a quorum were moving through the NLRB and subsequently the courts of appeal. *See, e.g.*, *Laurel Baye Healthcare, LLC*, 352 NLRB 179 (2008) (decided one week before injunction was filed in present case).

Despite the passage of time, the union's negotiations for its initial collective bargaining agreement with the News-Press are ongoing and the union's position has been weakened by the absence of the key union-supporting employees who were discharged and by the remaining employees' fears stemming

from the filing of a complaint by an aggrieved employee to the issuance of an enforceable order) creates a huge incentive for employers to deliberately violate the statute knowing that they will reap the benefit of illegal conduct for a long time, if not permanently in the case of a successful defeat of an organizing campaign.").

from those discharges. Continued delay may cause the discharged employees to find other work, denying the union of the benefits of their active support and accumulated experience, and the passage of time thus does not obviate the need for injunctive relief. Nor does this subversion of the NLRA benefit the public interest.

The majority also glosses over a significant district court error, conceding they "are not entirely confident that the district court gave appropriate weight to the rights of the discharged employees." Maj. Op. at 1474. I agree. The district court erred in its acceptance of the News Press's alleged harm relating to the replacement workers it has hired because "the predominant focus under section 10(j) is the harm to the bargaining process," and the "rights of the employees who were discriminatorily discharged are superior to the rights of those whom the employer hired to take their places." *Aguayo*, 853 F.2d at 750.

In emphasizing the Board's delay in seeking the injunction, rehashing its First Amendment arguments, and explaining away the district court's misunderstanding of important precedent, Maj. Op. 1473-75, the majority neglects discussion of the irreparable harms that exist regardless of any delay: rights of wrongfully discharged employees, *id.* at 750, the firings' damage to the organizing drive, *Scott*, 241 F.3d at 660, and potential weakening of the Board's remedial authority, *id.*, all of which are also relevant to the balance of the equities and the public interest.

Finally, in evaluating the fired employees' petition, the district court assumed the correctness of the ALJ's thorough findings, reasoning that it "lack[ed] a basis to conclude" that "animus toward the Union and its demands was not the motive for the [News-Press's] actions." The majority also finds no basis, because one does not exist, for questioning these serious determinations that employees seeking to form a union were fired only after union organizing began.

In short, the majority applied the incorrect legal standard, leading it to the incorrect result. "Instead of offering a credible explanation for its actions, the [News-Press] relied on a pretextual justification and contended that the First Amendment served as a shield that prevented the Board from challenging the decision and inquiring into its motives." *Passaic*, 736 F.2d at 1553. Because the majority begins by accepting the notion that who a newspaper employs necessarily determines its content, it finds the News-Press exempt from the labor laws other employers must follow. Instead, I would recognize the scope of the injunction is limited to reinstatement only, and under the injunction the News-Press would still be able to publish its paper as it sees fit. In failing to make this distinction, the district court applied the incorrect standard and analysis, abusing its discretion.

I would reverse and direct the district court to issue and enforce the injunction sought by the NLRB.