**Olivia GARCIA, Acting Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**SACRAMENTO COCA–COLA BOTTLING CO., INC., Respondent.**

**No. 2:10–cv–2176 FCD JFM.**

United States District Court, E.D. California.

Aug. 20, 2010.

Cecily Adams Vix, Micah Berul, National, Jill H. Coffman, Sarah Miranda McBride, Labor Relations Board, San Francisco, CA, for Petitioner.

Dennis R. Murphy, Murphy Austin Adams Schoenfeld, Sacramento, CA, David A. Rosenfeld, Weinberg Roger and Rosenfeld, Alameda, CA, for Respondent.

### MEMORANDUM AND ORDER

FRANK C. DAMRELL, JR., District Judge.

This matter is before the court on petitioner Olivia Garcia's ("petitioner"), Re-

gional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board (the "Board"), petition for an injunction under § 10(j) of the National Labor Relations Act. Petitioner seeks an interim order required respondent to recognize and bargain with Teamsters Local 150 (the "Union" or the "affiliated Union") pending the Board's final disposition in this case. Respondent Sacramento Coca–Cola Bottling Co., Inc. ("respondent" or the "Employer") opposes the petition. The court heard oral argument on August 20, 2010. For the reasons set forth below, the Board's petition for a § 10(j) injunction is GRANTED.

## BACKGROUND [1]

Respondent is a California corporation that owns franchise agreements with Coca–Cola Bottling Co., Inc., under which it is authorized to manufacture, distribute, and sell Coca Cola products in the Sacramento and Modesto geographical areas. (Decl. of Rob Siebers in Supp. of Opp'n to Inj. ("Siebers Decl."), filed Aug. 18, 2010, ¶ 2.) Sacramento Coca–Cola Bottlers Employees Union ("SCCBE") was an in-house union, formed by the employees of respondent in 1966. (Affs. In Support of Pet. for Inj. ("App,"), filed Aug. 13, 2010, at 13.) The unit is comprised of all regular employees engaged in production, distribution and maintenance. (App. at 48.) The unit

is currently comprised of approximately 310–320 of respondent's employees. (App. at 31; Siebers Decl. ¶ 6.) The collective bargaining agreement between respondent and the unit extends from November 1, 2009 through October 31, 2013. (*Id.* at 47; Siebers Decl. ¶ 36; Ex. O to Siebers Decl.)

On March 21, 2010 a vote was held to elect ten new Board of Governors for SCCBE (the "SCCBE Board"). New SCCBE Board members included Jerry Rezendes ("Rezendes") and Dennis Young ("Young") as Chairman and President of the SCCBE Board, respectively. (App. at 1, 13, 25.) During the three years prior to taking office, Rezendes and Young had been in contact with Rocky Thomas ("Thomas"), an organizer/business representative of Teamsters Local 150, to discuss the possibility of merging SCCBE with Teamsters Local 150. (*Id.* at 29.) After the March 21 election, these discussions took on a more serious nature. (*Id.* at 30.)

A few weeks later, a SCCBE meeting was scheduled for April 25, 2010 as "a general meeting to introduce the newly elected members of the board," discuss finances, and exchange contact information. (Decl. of Robert Giron in Supp. of Opp'n to Inj. ("Giron Decl."), filed Aug. 18, 2010, ¶ 2; Ex. A to Giron Decl.) Prior to the meeting, approximately four SCCBE Board members were aware of the merger

---

**1.** The facts of the case are taken from the affidavits and supporting documents submitted by the parties. Respondent filed various objections to petitioner's evidence. As the court does not rely on the challenged evidence in rendering its conclusion, respondent's objections are OVERRULED as moot.

Respondent also requested an evidentiary hearing and the opportunity to present oral testimony due to "credibility issues" involved in this litigation. However, because "a conflict of evidence does not preclude the Regional Director from making the requisite showing for a § 10(j) injunction," and because the

facts about which respondent contends there are credibility concerns are irrelevant to the court's analysis, the court DENIED respondent's request. *Scott ex rel. NLRB v. Stephen Dunn & Assocs.,* 241 F.3d 652, 662 (9th Cir. 2001) (abrogation recognized on other grounds); *see also NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1571 (7th Cir.1996) (holding that the district court applied the wrong standard when it resolved credibility conflicts in the evidence instead of evaluating whether the petitioner had presented sufficient evidence to demonstrate a "better than negligible chance of prevailing before the Board").

discussions. (*Id.* at 2, 6, 7, 29.) Immediately before the meeting, several more were made a aware that there were ongoing merger discussions that were kept secret because Rezendes was afraid of retaliation by respondent for suggesting the merger. (*Id.* at 2, 6, 18.)

Fifty to sixty members attended the April 25 meeting. (*Id.* at 7.) Thomas and Teamsters 150 attorney, David Rosenfeld ("Rosenfeld"), were invited to the meeting by Rezendes and were also in attendance. (*Id.* at 26.) After the SCCBE Board members were introduced, a member brought up the possibility of merging with Teamsters 150. (*Id.* at 21.) A motion on the issue was made and seconded.[2] (*Id.*) A heated discussion ensued, during which respondent asserts that Young told the audience that if the vote to merge was not taken straight away, respondent would make the members jobs very hard on them, harass them and/or fire them. (*Id.* at 44, 11; Siebers Decl. ¶ 17; Ex. D to Siebers Decl.) Eventually, Thomas took the floor and read the proposed merger agreement ("Agreement")and answered questions about the potential merger. (App. at 30.)

Members were asked to stand on opposites sides of the room to show their support or opposition to the merger. (App. at 12, 23, 30.) Around 50 members supported the merger; approximately 5 members opposed the merger. (*Id.* at 8, 14, 27, 30.) However, in light of the discussions and the fact that most members were not aware of the merger idea, the SCCBE Vice President suggested that any merger vote should be held at a later time so all members could be consulted. (*Id.* at 44.) Young did not agree. He stated that everyone had notice and was invited to come and that the meeting was one of the largest turnouts they had ever had. (*Id.* at 18.)

A hand vote of the SCCBE Board was taken and the merger with Teamsters 150 was agreed upon by a majority of the Board of Governors. (*Id.* at 14.)

Following the vote by the SCCBE Board, SCCBE's president executed the Agreement with Teamsters 150. (*Id.* 34.) The Agreement called for retaining the current collective bargaining agreement between SCCBE and respondent in full force and effect, with no changes in terms or conditions. (*Id.*) The collective bargaining agreement is set to expire in October 2013 and at the time the Union will bargain a new contract. (*Id.* at 47.)

Under the current Agreement employees can become members of the Union without paying an initiation fee and dues will remain for the same for another 18 to 36 months. (*Id.* at 34.) Any later increase in dues must be approved by the Union members employed at Sacramento Coca–Cola Bottling Co. following the April 25 membership meeting. (*Id.* at 40.)

All Board members were asked and agreed to serve as shop stewards for the Union. (*Id.* at 3, 9, 28, 38.) Once they receive the requisite training, shop stewards will be able to settle grievances at the first or second step of the grievance procedure without assistance from a Union representative; six shop stewards who are former Board of Governors members attended the shop steward training on June 19. (*Id.* at 39.)

All assets and liabilities of SCCBE were transferred to the Union, including the sole assets of approximately $87,000. (Siebers Decl. ¶ 6.) These funds were deposited in a separate checking account con-

---

**2.** Hieu Nguyen was the employee who seconded the motion. She was involved in the initial discussion with Rezendes about merg-ing SCCBE with Teamsters 150 and explained that she was asked to bring this idea up at the April 25 meeting. (*Id.*)

trolled by the Union to be used only for representation expenses related to the Sacramento Coca–Cola Bottling Co. unit employees. (App. at 34.)

On April 27, 2010, the affiliated Union sent a letter to respondent, advising it that SCCBE had merged with Teamsters Local 150 and designating Thomas as the Union representative. (Siebers Decl. ¶ 14; Exhibit B to Siebers Decl.) In response, on April 28, respondent posted a letter at the worksite, questioning the validity of the merger. (App. at 37.; Siebers Decl. ¶ 15; Ex. C to Siebers Decl.) On April 29, ten employees posted a letter protesting the merger, stating that members would be asked to sign a petition to dissolve any relationship with Teamsters Local 150. (Siebers Decl. ¶ 19.) On May 3, 2010, a petition stating "I DO NOT WANT TO BE AFFILIATED WITH TEAMSTERS LOCAL 150" began circulating among the employees. (App. at 103–119; Siebers Decl. ¶ 7; Ex. K to Siebers Decl.) Fifty-five signatures were obtained on the first day of the petition. (Siebers Decl. ¶ 21.)

Three days later, on May 6, 2010, the Union conducted a noticed meeting for respondent's employees. Only 10 of the 308 bargaining unit employees attended. (Siebers Decl. ¶ 31; Ex. L to Siebers Decl.)

On May 20, 2010, respondent's counsel sent a letter to the Union's counsel, expressly providing that it did not recognize the affiliated Union. (App. at 125.)

During the summer of 2010, several grievances were filed by the Union on behalf of employees. (App. at 32, 33, 39.) Petitioner asserts that all 16 of these grievances were ignored and remain unresolved. (Decl. Vigent ¶ 9.) Respondent asserts that it has attempted to resolve all grievances filed since April 25, 2010 only with representatives of "SCCBE," not the Union. (Id.)

### 1. Respondent's and Employee Filings with the Region

On May 13, 2010, respondent filed a charge with Region 20 (the "Region"), claiming the Union violated Section 8(b)(1)(A) of the National Labor Relations Act ("NLRA") by restraining, coercing, and threatening employees in order to gain support for the merger. (Decl. Acting Regional Director in Supp. of Pet. for Inj. ("Garcia Decl."), filed Aug. 13, 2010, ¶ 6.) The charge was investigated, and on June 30, 2010 the Region dismissed it after determining it was without merit. (Decl. of Dennis S. Murphy in Supp. of Opp'n to Inj. ("Murphy Decl."), filed Aug. 18, 2010, ¶ 5; Garcia Decl. ¶ 6.) On July 12, 2010, respondent appealed the decision. (Garcia Decl. ¶ 6; Siebers Decl. ¶ 34.) A month later, on August 12, 2010, respondent's appeal was denied by NLRB Office of Appeals. (Murphy Decl. ¶ 4–5; Ex. C to Murphy Decl.)

On May 25, 2010, an employee submitted a petition to the Board, seeking to recall the current Union officials. (Decl. of Robert Giron in Supp. of Opp'n to Inj. ("Giron Decl."), filed Aug. 18, 2010, ¶ 4.) The Board would not accept the petition. (Id.)

On June 28, 2010, respondent filed petitions for a representative (RM) election with the Region. (Murphy Decl. ¶ 6.) Attached to the petitions, respondent submitted a supplemental petition, stating that the signatories did not want to be affiliated with Teamsters Local 150, signed by 56% of the bargaining unit employees. (Id.; Siebers Decl. ¶ 7.) The employees continued to gather signatures and, as of the date of the hearing, the employee petition has been signed by 173 bargaining unit employees. (Giron Decl. ¶ 5.) On July 7, 2010, the Region dismissed the employer's petitions for an election, citing both the contract bar rule and a charge filed by the

Union. (Ex. to Pet'r's Reply Brief, filed Aug. 19, 2010.)

## 2. The Current Litigation

On May 3, 2010, the Union filed an unfair labor practice charge against respondent alleging violation of Section 8(a)(1)(5) of the National Labor Relations Act ("NLRA") for refusing to bargain in good faith. (Decl. Acting Regional Director in Supp. of Pet. for Inj. ("Garcia Decl."), filed Aug. 13, 2010, ¶ 3.) On June 2, 2010, respondent submitted a response to Teamsters 150's charge with a petition attached, signed by approximately 130 employees stating they do not want to be affiliated with Teamsters. (Murphy Decl. ¶ 3; Ex. B to Murphy Decl.)

On June 20, 2010, Region 20 issued a complaint against Respondent on the basis of Teamster Local 150's unfair labor practice claim. A hearing on the complaint was scheduled to be heard on August 25, 2010. However, on August 16, 2010, the Union filed a new unfair labor practice charge with the Board that is related to petitioner's unfair labor practice claim. (Aff. of Regional Director, filed Aug. 19, 2010, ¶ 2.) This action will be heard by an ALJ in October 2010. (*Id.* ¶ 4.)

On August 13, 2010, petitioner filed 10(j) motion in this court, seeking an interim bargaining order requiring respondent to recognize and bargain with the Union during the pendency of proceedings before the ALJ and the NLRB.

## ANALYSIS

■ Section 10(j) of the National Labor Relations Act ("NLRA") provides that, upon issuance of a complaint charging an unfair labor practice, the Board may petition the United States district court for appropriate temporary relief or restraining order, and the court "shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j) (2009). Injunctive relief under § 10(j) is intended to preserve the status quo pending final action by the Board. *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 660 (9th Cir.2001) (abrogation recognized on other grounds).

■ In determining whether interim relief is "just and proper" under the NLRA, the court considers traditional equitable criteria in determining whether injunctive relief should be granted. *Miller v. Pac. Med. Ctr.*, 19 F.3d 449, 459 (9th Cir.1994) (abrogation recognized on other grounds). The Ninth Circuit has recently clarified the controlling standard for injunctive relief in light of the Supreme Court's decision in *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1050–52, No. 09–35756, 2010 WL 3665149, at *6–7 (9th Cir. Sept. 22, 2010); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.2009). A party seeking a preliminary injunction must demonstrate that he is likely to succeed on the merits, that irreparable harm is likely in the absence of preliminary relief, that the balance of equities tips in favor of such relief, and that an injunction is in the public interest. *Am. Trucking*, 559 F.3d at 1052. A preliminary injunction is also appropriate when the moving party demonstrates "that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the [moving party's] favor," so long as that party can establish the other *Winter* factors, including the likelihood of irreparable harm. *Alliance for Wild Rockies*, 622 F.3d at 1052, 2010 WL 3665149, at *7. However, when evaluating a petition under § 10(j), the court must analyze the request "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to

preserve the Board's remedial power while it processes the charge." *Miller,* 19 F.3d at 459–60.

"In assessing whether the Board has met its burden, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *Id.* at 460 (citing *NLRB v. City Disposal Sys., Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984)) ("[O]n an issue that implicates [the Board's] expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference[.]"); *Ford Motor Co. v. NLRB,* 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979) ("Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute.").

## A. Success on the Merits

■ The district court must evaluate the likelihood of success in the context that the Board's determination on the merits will be given considerable deference on appeal. *Id.* "A conflict in evidence does not preclude the Regional Director from making the requisite showing for a § 10(j) injunction." *Scott,* 241 F.3d at 662; *see*

*Seeler v. Trading Port, Inc.,* 517 F.2d 33, 36–37 (2d Cir.1975) (holding that where "there are disputed issues of fact in the case, the Regional Director should be given the benefit of the doubt in a proceeding for § 10(j) relief"). "Rather, to satisfy the 'likelihood of success' prong of the traditional equitable test, he need only show 'a better than negligible chance of success.'" *Id.* (citing *Electro–Voice,* 83 F.3d at 1568). Moreover, the Ninth Circuit has instructed that "[e]ven on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel." *Miller,* 19 F.3d at 460 (quoting *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union,* 494 F.2d 1230, 1245 (2d Cir.1974)). On a motion for a 10(j) injunction, it is not the duty of the district court "to resolve the factual disputes or the legal issues involved. Those are for the Board." *Kennedy v. Teamsters Local,* 443 F.2d 627, 630 (9th Cir.1971). "In short, the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Miller,* 19 F.3d at 460.[3]

### 1. Question of Representation

■ Petitioner asserts that it can establish a likelihood of success on the merits

---

**3.** Respondent incorrectly asserted during oral argument that the *Miller* standard with respect to likelihood of success on the merits is no longer applicable after the Ninth Circuit's decisions in *McDermott v. Ampersand Publ'g, LLC,* 593 F.3d 950 (9th Cir.2010) and *Small v. Operative Plasters' & Cement Masons' Int'l Ass'n Local 200, AFL–CIO,* 611 F.3d 483 (9th Cir.2010). The *Miller* standard was overruled regarding its analysis of irreparable injury, *see infra* at 1216, but *not* likelihood of success on the merits. The *McDermott* court specifically reversed *Miller*'s prior holding that irreparable injury could be presumed in light of the Supreme Court's decision in *Winter.* 593 F.3d at 957. It did not address the district

court's review of the facts under *Miller.* Further, while the *Small* court addressed *Miller*'s likelihood of success prong in dicta, the court noted that *Small* was a § 10(*l*) case, *not a § 10(j) case,* and that the rationale for *Miller*'s standard regarding review of the facts did not apply where the Region is *required* to petition for injunctive relief under § 10(*l*). 611 F.3d at 491 & n. 3. Accordingly, the court does not conclude that the Supreme Court's decision in *Winter,* nor the Ninth Circuit's cases interpreting its applicability to labor disputes, substantially changes the standard applied in determining the likelihood of success on the merits for purposes of a § 10(j) injunction.

because, in accordance with SCCBE's by-laws, a majority of the Board of Governor's approved the merger. Respondent contends that petitioner cannot demonstrate a likelihood of success on the merits because there is a question of representation, as it is unclear whether a majority of employees continue to support the Union after it merged with Teamsters Local 150.

Section 7 of the NLRA "guarantees employees the right 'to bargain collectively through representatives of their own choosing,' 29 U.S.C. § 157, and the Board is empowered to determine representation on petition of employees or the employer." *NLRB v. Fin. Inst. Emps. of Am. Local 1182 ("Seattle–First")*, 475 U.S. 192, 198, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986) (citing 29 U.S.C. § 159(c)(1)(A)(i), 159(c)(1)(B)). The NLRA also "recognizes that employee support for a certified bargaining representative may be eroded by changed circumstances." *Id.* The Supreme Court has noted that "a new affiliation may substantially change a certified union's relationship with the employees it represents," and that "[t]hese changed circumstances may in turn raise a 'question of representation,' if it is unclear whether a majority of employees continue to support the reorganized union." *Id.* at 202, 106 S.Ct. 1007.[4]

The NLRA "assumes that stable bargaining relationships are best maintained by allowing an affiliated union to continue representing a bargaining unit unless the Board finds that the affiliation raises a question of representation." *Id.* at 209, 106 S.Ct. 1007. "If the Board finds that affiliation raises a question of representation 'undermining ... the Board's own election and certification procedures,' it can refuse to consider the union's unfair labor practice charge, and is authorized to conduct a representation election." *Id.* at 202, 106 S.Ct. 1007 (quoting *Amoco Production Co.*, 262 N.L.R.B. 1240, 1241 (1982)).[5] *"Any uncertainty on the employer's part does not relieve him of his obligation to bargain collectively." Id.* at 209, 106 S.Ct. 1007 (emphasis added).[6] The Supreme Court has expressly noted that it has "rejected the position that employers may refuse to bargain whenever presented with evidence that their employees no longer support their certified union." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 790, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996). The Court reasoned that "[t]o allow employers to rely on their employees' rights in refusing to bargain with the formally designated union is not conducive to [industrial piece], it is inimical to it." *Id.* (quoting *Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176). Rather, an

4. In the case of affiliation, a newly affiliated union may choose not petition the Board to amend its certification, "but will instead wait to see whether the employer will continue to bargain. If the employer refuses to bargain, the union may then file an unfair labor practice charge with the Board." *Id.* at 200 n. 8, 106 S.Ct. 1007. This is the procedural posture in this case. However, the Board has "used the same standards to examine affiliations whether the issue arose as a defense to an unfair labor practice charge or in a petition to amend a certification." *Id.*

5. However, the Supreme Court expressly noted that the NLRA "authoriz[es] the Board to

conduct a representation election *only* where affiliation raises a question of representation." *Id.* at 203, 106 S.Ct. 1007 (emphasis in original). Where a question of representation has not been sufficiently raised, the Board has no authority to act. *Id.*

6. At oral argument, respondent's counsel argued that *Seattle–First* supported his contention that an employer has the right to unilaterally withdraw recognition after an affiliation if it reasonably believes the majority of unit employees does not support the affiliated union. This is not the holding of *Seattle–First*.

employer's relief is to petition the Board, not to rely on employees' rights. *Seattle–First*, 475 U.S. at 209, 106 S.Ct. 1007; *see Brooks*, 348 U.S. at 103, 75 S.Ct. 176; *see The Raymond F. Kravis Center for the Performing Arts ("Kravis")*, 351 N.L.R.B. 143, 147 (2007) (*"[W]hen there is a union merger or affiliation, an employer's obligation to recognize and bargain with an incumbent union continues* unless the changes resulting from the merger or affiliation are so significant as to alter the identity of the bargaining representative.") (emphasis added).

Moreover, the NLRB has concluded that "an employer is not relieved of its bargaining obligation merely because the merger or affiliation is accomplished without due process safeguards." *Kravis*, 351 N.L.R.B. at 143, 146 (holding that "the lack of a membership vote concerning union affiliation is insufficient to raise a question concerning representation").[7] Further, the NLRB has held that an employer may not refuse to recognize a valid affiliation even though a majority of the employees later states that they do not support the affiliation. *Tawas Indus., Inc.*, 336 N.L.R.B. 318, 318–19 (2001). In *Tawas*, a majority of the respondent's employees voted to affiliate its small independent union, TIWA, with UAW. *Id.* at 318. However, subsequent to the vote but before UAW had committed any time or resources to representing the employees, a majority of employees conveyed to the respondent that they did not want to be represented by UAW. *Id.* at 319. The respondent informed UAW that it had concluded that the affiliation was not supported by a majority of the employees and thus, refused to recognize the affiliation. *Id.* at 318. The NLRB held that the respondent "could not base its refusal to recognize TIWA's undisputedly valid affiliation with the UAW on the employees' subsequent disaffiliation effort, even if that effort is regarded as untainted, objective evidence that the affiliated union had lost majority support." *Id.* at 319. The Board reasoned that affiliation or disaffiliation decisions involved essentially internal matters to be governed by the union's own procedures and "that are not effectively subject to an employer's veto." *Id.* Because union procedures were used to accomplish the affiliation, but were not used to undo the affiliation, the respondent was obligated to recognize the affiliation. *Id.*

In this case, SCCBE's By–Laws provide, in pertinent part, that "[t]he function of the Board of Governors is to govern the general business of the union" and that "all motions coming before the Board of Governors shall be passed only by a majority vote." (App. 119–20). Petitioner presents evidence that on April 25, 2010, the President of the Board put the matter of merging SCCBE with Local Teamsters 150 to a vote, and the Board voted by a majority to merge with Teamsters Local 150. Furthermore, there is no evidence that the employees or Union subsequently initiated or completed steps to disaffiliate. Accordingly, petitioner has set forth some evidence that the affiliation with Teamsters Local was made in accordance with SCCBE's bylaws and was valid. *See Kravis*, 351 N.L.R.B. at 143, 146–47 (holding that affiliation was valid when it was conducted in accordance with the union's constitution but without a vote by union members).

Respondent contends that the vote by the Board of Governors has no relevance because this type of action requires an amendment to the SCCBE By–Laws be-

---

7. At oral argument, respondent also asserted that the Board's decision in *Kravis* supported unilateral withdrawal of recognition by an employer if an affiliation was not supported by a majority of employees. This is not the holding of *Kravis*.

cause it eliminates the Bottler Union as the unit's exclusive representative, as guaranteed by that document. Pursuant to SCCBE By–Laws, the "By–Laws may be amended by a two-thirds (2/3) majority vote of the members present at a duly called meeting." (App. 122.) However, the court need not reach the determination of which By–Laws apply to the decision to affiliate for purposes of a 10(j) injunction. Rather, petitioner has submitted evidence to support its tenable legal theory, namely that a majority vote by the Board of Governors was sufficient because the Union was not eliminated, but merely merged with Teamsters Local 150. This is sufficient to set forth a threshold showing of likelihood of success.

Respondent also contends that it properly petitioned for an election instead of recognizing Teamsters Local 150 because it had evidence that a majority of employees did not support affiliation.[8] Respondent's implied assertion, that an employer is shielded from a refusal to bargain charge by the filing of a petition for election, is directly contradicted by Ninth Circuit precedent. The Ninth Circuit has expressly held that "the filing of an RM petition by an employer does not in itself suspend the employer's duty to bargain. Nor is that duty to bargain suspended when the Regional Director schedules a hearing based on the employer's petition alone." *N.T. Enloe Mem'l Hosp. v. NLRB*, 682 F.2d 790, 794 (9th Cir.1982); *see Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1954) ("If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, *while continuing to bargain in good faith* at least

until the Board has given some indication that his claim has merit.") (emphasis added); *see also RCA del Caribe, Inc.*, 262 N.L.R.B. 963, 965 (1982) (holding that the filing of a representation petition does not require nor permit an employer "to withdraw from bargaining or executing a contract with an incumbent union"). The Ninth Circuit reasoned that there is no compelling policy reason to suspend such an obligation because "[o]therwise, an employer could file a petition and rely on the petition alone as justification for suspension of bargaining." *Id.* Accordingly, respondent's assertion that it properly filed a petition for a representative election, which was denied and is currently on appeal, does not provide an affirmative defense to plaintiff's allegations of unfair business practices.[9]

### 2. Substantial Continuity

Petitioner also asserts that it is likely to succeed on the merits because there is substantial continuity in representation between SCCBE and Local Teamsters 150. Respondent, however, contends that there is a substantial change in the relationship that justifies its refusal to recognize or bargain with the affiliated Union.

The Supreme Court has recognized that in the context of an affiliation, just as "with any organizational and structural change, [the] new affiliation may substantially change a certified union's relationship with the employees it represents." *Seattle–First*, 475 U.S. at 202, 106 S.Ct. 1007. These substantial changes may then raise a question of representation and thus, "to protect the employees' interests, the situation may require that the

---

8. Moreover, respondent cites no authority for its other implied assertion that there must be demonstrated majority support for the newly merged union in order for that merger to be valid. *Cf. Kravis,* 351 N.L.R.B. at 143, 146–47.

9. The court notes that the representative election was requested by the employer, not employees, a difference that the Ninth Circuit has found important. *Id.* at 794 n. 2.

Board exercise its authority to conduct a representation election." *Id.* (citing 19 U.S.C. § 159(c)(1)). The Court has cautioned, though, that "the Board's decision must take into account that '[t]he industrial stability sought by the Act would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship.'" *Id.* at 202–03, 106 S.Ct. 1007 (quoting *Canton Sign Co.,* 174 N.L.R.B. 906, 909 (1969), *enf. denied on other grounds,* 457 F.2d 832 (6th Cir.1972)).

In determining whether there is substantial continuity after an affiliation, the Board considers the totality of the circumstances, "eschewing the tendency toward a 'mechanistic approach' or the use of a 'strict checklist.'" *Mike Basil Chevrolet, Inc.,* 331 N.L.R.B. 1044, 1044 (2000) (quoting *Sullivan Bros. Printers,* 317 N.L.R.B. 561, 563 (1995), *enf.* 99 F.3d 1217 (1st Cir.1996)). Rather, the Board has held that "the critical question is whether the 'changes are so great that a new organization has come into being.'" *Id.* at 1044–45; *May Dep't Stores Co.,* 289 N.L.R.B. 661, 665 (1988) ("[T]he general test for determining whether the affiliation of a bargaining representative with another labor organization raised a question concerning representation is whether the affiliation produces a change that is *sufficiently dramatic* to alter the union's identity.") (emphasis in original) (internal quotations and citations omitted). The Board considers factors such as:

> continued leadership responsibilities by the existing union officials; the perpetuation of membership rights and duties, such as eligibility for membership, qualification to hold office, oversight of executive council activity, the dues/fees structure, authority to change provisions in the governing documents, the frequency of membership meetings, the continuation of the manner in which contract negotiations, administration, and grievance processing are effectuated; and the preservation of the certified union's physical facilities, books, and assets.

*W. Commercial Transp.,* 288 N.L.R.B. 214, 217 (1988). The Board has previously rejected relative sizes of the two organizations, some loss of autonomy, or a subsequent lack of total control in handling grievances as a basis for finding discontinuity. *Mike Basil Chevrolet, Inc.,* 331 N.L.R.B. at 1044 (holding that there was substantial continuity despite merger with larger organization, some loss of autonomy previously enjoyed by employees, and loss of complete control over, though not involvement in, grievance handling); *CPS Chem. Co.,* 324 N.L.R.B. 1018, 1021 (1997), *enf.* 160 F.3d 150 (3d Cir.1998) (holding that neither differences in size, bylaws, and internal procedures, nor the transfer and commingling of assets was sufficient to demonstrate a discontinuity of representation); *May Dep't Stores Co.,* 289 N.L.R.B. at 665 (holding that there was no discontinuity where the record established some organization changes and a slight diminution in autonomy, but where the leaders and essential structures remained the same); *cf. W. Commercial Transp.,* 288 N.L.R.B. at 217–18 (holding that there was not substantial continuity where original union lost virtually all its autonomy by being totally submerged by the affiliated union, no role was open to the original union's officers, and all day-to-day contract administration was taken over by the affiliated union's staff member). Moreover, the Board has concluded that substantial continuity may be demonstrated by evidence such as the eligibility of current members to join the larger union without paying its initiation fees and without an immediate significant increase in membership dues. *CPS Chem. Co.,* 324 N.L.R.B. at 1021.

In this case, petitioner presents evidence that the merger agreement between SCCBE and Teamsters Local 150 calls for retaining the current collective-bargaining agreement between SCCBE and respondent in full force and effect, with the merger changing no terms or conditions of employment. (App. at 34.) At the time the current contract expires in November 2013, the Union intends to bargain a new contract based on proposals generated by the bargaining unit membership and presented to its negotiating committee through an elected proposal committee. (*Id.* at 40.) The Union has also indicated that it intends for the former members of SCCBE's Board of Governors to serve on the negotiating committee. (*Id.*) While all assets and liabilities of SCCBE were transferred to the Union, including the sole assets of approximately $87,000, it was deposited in a separate checking account controlled by the Union to be used only for representation expenses related to the Sacramento Coca–Cola Bottling Co. unit employees. (*Id.* at 41.) Further, current employees can become members of the Union without paying an initiation fee and dues will remain for the same for another 18 to 36 months. (*Id.* at 40.) Moreover, any increase in dues must be approved by the Union members employed at Sacramento Coca–Cola Bottling Co. (*Id.*) Finally, following the April 25 membership meeting, all ten Board of Governors were asked and agreed to serve as shop stewards for the Union. (*Id.* at 38.) Once they receive the requisite training, shop stewards will be able to settle grievances at the first or second step of the grievance procedure without assistance from a Union representative; six shop stewards who are former Board of Governors members attended the shop steward training on June 19. (*Id.* at 39.) Based upon this evidence, petitioner has made a showing that the merger between SCCBE and Teamsters Local 150 did not dramatically alter the Union's identity or create a wholly new organization.

While respondent disputes the continuity between SCCBE and Teamsters Local 150, this court need not reach the ultimate determination of this issue. Applying the undisputed terms of the merger agreement to Board precedent, petitioner has demonstrated that (1) the current members to join the larger Union without paying its initiation fees and without an immediate significant increase in membership dues, *see CPS Chem. Co.*, 324 N.L.R.B. at 1021; (2) a majority of the Board of Governors will have a leadership role over its unit employees as shop stewards, *see May Dep't Stores Co.*, 289 N.L.R.B. at 665; (3) the stewards will be involved in, though not have control over, the grievance, *see May Dep't Stores Co.*, 289 N.L.R.B. at 665; and (4) the assets of SCCBE will continue to be used solely for representation expenses related to unit employees. Accordingly, petitioner has presented some evidence and a tenable legal theory that there is substantial continuity in representation between SCCBE and Local Teamsters 150, and thus has demonstrated a likelihood of success on the merits on this issue for purposes of a 10(j) injunction.

### 3. Contract Bar Doctrine

■ Petitioner also asserts that it has demonstrated a likelihood of success on the merits because the petition signed by a majority of employees does not trigger a representation election because the contract bar doctrine prohibits any such election. Respondent contends that the contract bar rule does not apply to the circumstances in this case.

■ The Board's contract bar doctrine generally provides that a contract with a fixed term duration of no more than three (3) years serves as a bar to elections for the entire three year term. *General Cable*

*Corp.*, 139 N.L.R.B. 1123, 1124–25 (1962). Where, as in this case, the contract has a longer fixed term, the contract bar precludes an election for the initial three years. *Id.*

The purpose of the rule is "to promote industrial stability between contractual partners and to afford employees a reasonable opportunity to change or eliminate their bargaining representative." *East Mfg. Corp.*, 242 N.L.R.B. 5, 6 (1979). In order to protect the bargaining atmosphere, the rule is applied "even if a majority of the employees withdraw their support." *Pioneer Inn Assocs. v. NLRB*, 578 F.2d 835, 838 (9th Cir.1978) (citation omitted). Indeed, the Board has expressly stated, "we cannot interpret our contract-bar rules in such a way as to permit employers or certified unions to take advantage of whatever benefits may accrue from the contract with the knowledge that they have an option to avoid their contractual obligations and commitments through the device of a petition to the Board for an election." *Montgomery Ward & Co.*, 137 N.L.R.B. 346, 348–49 (1962).

The Board has examined the applicability of the contract bar rule in the context of an affiliation case where, as here, employees expressed dissatisfaction with the union after the merger took place. *Tawas*, 336 N.L.R.B. at 320. In *Tawas*, the Board expressly held that "a disaffiliation is a change in the legal and institutional relationships between two unions. It cannot be carried out externally to the unions." *Tawas*, 336 N.L.R.B. at 320. To hold otherwise and allow an employer to refuse to recognize an affiliation, would effectively give respondent "power to veto" and allow outside interference with internal union decisionmaking protected by the NLRA. *Id.* Therefore, the Board instructed that when a Union effects a valid affiliation and an employer has doubts about his duty to continue bargaining, "it is [the employer's] responsibility to petition the Board for relief at the appropriate time." *Id.*[10] Moreover, the Board expressly noted that "[u]nder well-established principles, the respondent could not lawfully withdraw recognition from the union while the collective-bargaining agreement was in effect, even if a majority of bargaining unit members no longer supported" the affiliated Union. *Id.*

The court finds that the Board's decision in *Tawas* substantially supports petitioner's position that the contract bar rule applies to this case and prevents respondent from seeking an election or withdrawing recognition from the Union. As set forth above, petitioner has presented sufficient evidence and argument to support its assertion that a valid affiliation was effected at the April 25, 2010 meeting and that there was substantial continuity in representation. *See Yates Industries*, 264 N.L.R.B. 1237, 1249 (1982) ("[A] mere change in designation or affiliation of the bargaining representative does not of itself warrant a conclusion that a contract is no longer a bar nor does it automatically relieve the employer of the obligation to bargain with the 'successor' union."). Further, it is undisputed that the collective bargaining agreement is in effect from November 1, 2009 though October 31, 2013. As such, the contract bar doctrine does not permit a window for questioning representation until 2012. Accordingly, petitioner has shown a likelihood of success on that merits that, as in *Tawas*, respondent must continue to bargain with the Union, even if a majority of bargaining members no longer support the affiliated Union.

---

**10.** The Board also noted that to the extent employees want to undo a union affiliation, "they can—and must—pursue their goal through internal union channels." *Id.*

### 4. Decertification/Disaffiliation Petition [11]

■ Petitioner also asserts that it has demonstrated a likelihood of success on the merits because the petition, signed by 56% of the employees and attached to the employer's RM petition, is an invalid instrument with which to decertify the Union. Respondent contends that the employee petition is a valid instrument that clearly sets forth the intention of the signatories to express the desire not to be represented by a Union that is affiliated with Teamsters Local 150. Impliedly, respondent contends that it was entitled to withdraw recognition based upon a lack of majority support, evidenced by the petition.[12]

"[A]n employer may unilaterally withdraw recognition from an incumbent union only where the union has actually lost the support of the majority of the bargaining unit employees." *Levitz Furniture Co. of the Pacific, Inc.*, 333 N.L.R.B. 717, 717, 723 (2001). In *Levitz*, the Board adopted a more stringent standard for withdrawals of recognition. *Id.* at 723. In doing so, the Board relied upon the fundamental policies of the NLRA, specifically those underlying the presumption of continuing majority status: protecting employees right to choose or reject collective-bargaining representatives; encouraging collective bargaining; and promoting stability in bargaining relationships. *Id.* In light of these underlying goals, the Board held that "an employer who *withdraws* recognition from an incumbent union, in the honest but mistaken belief that the union has lost majority support, should be found to violate Section 8(a)(5)." *Id.* at 725. Good faith is not a defense. *Id.* The Board emphasized "that an employer with objective evidence that the union has lost majority support—for example, a petition signed by a majority of the employees in the bargaining unit—withdraws recognition at its peril." *Id.* Further, the Board acknowledged that it concluded "it entirely appropriate to place the burden of proof on employers to show actual loss of majority support." *Id.*

In this case, the evidence demonstrates that respondent immediately withdrew recognition of the Union after it received notice of SCCBE's merger with Teamsters Local 150 on April 27, 2010 and before it had any evidence that a majority of employees allegedly did not support the affiliated Union. Specifically, on April 28, re-

---

11. Petitioner disputes the validity of the petition on the basis that it simply opposes affiliation and does not evince the requisite intent to decertify the Union. As set forth above, the Board has noted that disaffiliation efforts made directly with an employer is invalid. *Tawas*, 336 N.L.R.B. at 320. However, assuming *arguendo* that the employee petition was sufficient to evince dissatisfaction with the Union representation, as set forth *infra*, respondent still did not have a valid basis for withdrawal of recognition at the time it acted.

12. To the extent respondent merely contends that the employee petition formed a "good faith, reasonable doubt" to support the Employer's of filing of a petition for representative election, as set forth above, such a filing does not relieve the employer from its obligations to recognize and bargain with the incumbent union, in this case, Local Teamsters 150. *See Dresser Indus., Inc.*, 264 N.L.R.B. 1088, 1089 (1982) ("[T]he mere filing of a decertification petition will no longer require or permit an employer to withdraw from bargaining or executing a contract with an incumbent union.").

The court also notes that, pursuant to the contract bar rule, "whatever the employer's dilemma, when faced with competing representational claims, it cannot withdraw recognition from an incumbent union during the term of the agreement." *Tawas*, 336 N.L.R.B. at 320. As set forth above, the court concludes that petitioner has shown that the contract bar rule likely applies in this case. However, for the sake of completeness, the court addresses the merits of respondent's argument regarding withdrawal of recognition.

spondent posted a letter questioning the validity of the merger after "at least 9" of the 308 unit employees contacted management to express their dissatisfaction with the merger. (App. at 37.) Further, petitioner presents evidence that beginning on May 7, 2010, respondent failed to respond to grievances file by the Union on behalf of unit employees. (App. at 32–33, 39.) By letter dated May 20, 2010, counsel for respondent expressly informed counsel for Teamsters Local 150 that respondent did not recognize Teamsters Local 150 as the collective bargaining representative of its employees and that it continued to recognize SCCBE as the exclusive bargaining representative. (App. at 125–26.) However, as of May 20, 2010, respondent was only aware of 130 employee signatures out of 308 unit employees on the disaffiliation petition. Indeed, respondent did not file a petition for a representative election with the Board until June 28, 2010, with a supplemental petition signed by 56% of the bargaining unit. (Murphy Decl. ¶ 6.) Accordingly, there is no evidence that, at the time the Employer withdrew recognition from the affiliated Union, it knew that the majority of unit employees actually did not support the affiliated Union. As such, respondent's arguments with respect to the effect of the decertification/disaffiliation petition are without merit.

**B. Irreparable Harm**

The Ninth Circuit has previously held that "if the Board demonstrates that it is likely to prevail on the merits, [the court] presume[s] irreparable injury," but "[i]f the Board has only a fair chance of succeeding on the merits, the court must consider the possibility of irreparable injury." *Miller*, 19 F.3d at 460. However, the Ninth Circuit recently clarified that "in evaluating the validity of the district court's analysis of the equitable factors, we must employ the Supreme Court's recent interpretation of the threshold showing

necessary for granting such an 'extraordinary remedy.'" *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir.2010) (quoting *Winter*, 129 S.Ct. at 374–76). Accordingly, a party seeking interim injunctive relief under § 10(j) must demonstrate "that he is likely to suffer irreparable harm in the absence of preliminary relief." *Id.* (quoting *Winter*, 129 S.Ct. at 374).

The Ninth Circuit has noted that "the passage of the statute is itself an implied finding by Congress that violations will harm the public." *Miller*, 19 F.3d at 459. Further, the court "must take into account the probability that declining to issue the injunction will permit the unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Id.* at 460.

Moreover, courts have historically held that withdrawal of union recognition is often irreparable. *See Int'l Union of Elec., Radio & Machine Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C.Cir.1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find it represents only a small fraction of employees."); *Reichard v. Foster Poultry Farms*, 425 F.Supp.2d 1090, 1100 (E.D.Cal.2006). Specifically, the Supreme Court has noted, "Out of its wide experience, the Board many times has expressed the view that the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).

In light of the implicit finding by Congress and the evidence set forth in this case, petitioner has demonstrated that irreparable injury is likely to occur in the absence of injunctive relief, including an interim bargaining order. Specifically, petitioner presents evidence that anti-Union sentiment has increased among the employees over the time that respondent has refused to recognize the affiliated Union as the bargaining representative of its employees. While respondent presents evidence that 55 signatures were obtained on May 3, the first day the disaffiliation petition was available, it took until June 27, 2010 to obtain a majority of the bargaining unit employees to sign. In essence, the longer respondent refused to recognize the affiliated Union, the more dissatisfied employees apparently became with being affiliated with Teamster Local 150. Further, petitioner presents attendance at Union meetings has substantially declined since respondent has failed to recognize or bargain with the Union. This sequence of events lends credence to petitioner's contention that support for and confidence in the Union is waning because of respondent's continued refusal to recognize the Union.[13]

Therefore, petitioner has demonstrated a likelihood of irreparable injury in the absence of injunctive relief.

## C. The Balance of Hardships and Public Interest

■ "In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge. Thus, courts must consider the extent to which this interest is implicated under the circumstances of the particular case." *Miller,* 19 F.3d at 460. In this case, petitioner has presented evidence that the Union completed a valid merger and has maintained substantial continuity with SCCBE, but that it has been prevented by respondent from representing its members. As such, the public interest is served by recognizing the Union as the collective bargaining representative pending ultimate determination of the alleged unfair labor practices.

In weighing the balance of hardships, the court must similarly take into account the probability that declining to enter an injunction will render meaningless the Board's remedial authority. *Id.* The balance of hardships in this case can be stated succinctly. Given the evidence that Union support has been waning since respondent had refused to recognize the Union and has attempted resolve employee grievances without participation by the Union, the Union may continue to lose support and credibility while these claims are litigated without an interim bargaining order. In light of the strong showing petitioner has made on the merits, the balance of hardships weighs strongly in favor of requiring respondent to recognize the Union.

As such, the court finds that the public interest and the balance of hardships weighs in favor of granting the § 10(j) petition.

## ORDER

For the foregoing reasons, the Board's petition is GRANTED. It is hereby

ORDERED, ADJUDGED AND DECREED that, pending the final disposition

---

13. At oral argument, respondent's counsel, in arguing that there was no substantial continuity after the merger, asserted that bargaining unit employees have not received the same bereavement benefits. Petitioner's counsel asserted that the Union only became aware of this problem when respondent raised the issue in its opposition filed in this case. The court finds that the Union's inability to obtain this type of information is only further evidence of the likelihood of irreparable injury caused by respondent's conduct.

of the matters now pending before the National Labor Relations Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, be, and they hereby are, enjoined and restrained from:

(a) refusing to recognize and bargain with the Union as the exclusive collective-bargaining representative of Respondent's employees in the Unit, with respect to rates of pay, hours of employment, and other terms and conditions of employment;

(b) in any like or related manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

It is further

ORDERED, ADJUDGED AND DECREED that, pending the final disposition of the matters herein now pending before the National Labor Relations Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, shall take the following affirmative steps:

(a) recognize and bargain with the Union as the exclusive collective-bargaining representative of employees in the Unit, including processing grievances pursuant to the parties' current collective-bargaining agreement;

(b) post copies of the District Court's order at its facilities in all places where notices to its employees are normally posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement;

(c) Within ten (10) days of the District Court's order, hold a meeting or meetings,

scheduled to ensure the widest possible attendance, at which the District Court's order is to be read to the employees by a responsible management official or, at the Employer's option, by a Board Agent in that official's presence; and

(d) Within twenty (20) days of the issuance of the District Court's Decision and Order, file with the District Court and serve upon the Regional Director of Region 20 of the Board, a sworn affidavit from a responsible official describing with specificity the manner in which Respondent has complied with the terms of the Court's decree, including the locations of the posted documents.

IT IS SO ORDERED.